# SCHNEBLE v. FLORIDA

No. 68–5009.   Argued January 17–18, 1972—
Decided March 21, 1972

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. MARSHALL, J., filed a dissenting opinion in which DOUGLAS and BRENNAN, JJ., joined, *post*, p. 432.

*Clyde B. Wells* argued the cause and filed a brief for petitioner.

*George R. Georgieff*, Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief was *Robert L. Shevin*, Attorney General.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner Schneble and his codefendant Snell were tried jointly in a Florida state court for murder. At the trial neither defendant took the stand, but police

witnesses testified to certain admissions made by each defendant implicating both of them in the murder. Both defendants were convicted, and the Florida Supreme Court affirmed. This Court vacated and remanded the case for further consideration in the light of *Bruton* v. *United States,* 391 U. S. 123 (1968). *Schneble* v. *Florida,* 392 U. S. 298 (1968). Upon remand, the Supreme Court of Florida reversed Snell's conviction, finding that it had been obtained in violation of *Bruton,* but affirmed petitioner's conviction. We again granted certiorari, limited* to the question of whether petitioner's conviction had been obtained in violation of the *Bruton* rule. In the circumstances of this case, we find that any violation of *Bruton* that may have occurred at petitioner's trial was harmless beyond a reasonable doubt. We therefore affirm.

The State's case showed that a threesome consisting of petitioner, Snell, and the victim, Mrs. Maxine Collier, left New Orleans in a borrowed automobile en route to Florida. While they were traveling across the Florida Panhandle, Mrs. Collier was murdered, and her body placed in the trunk of the automobile. The body was then transported in the car to the environs of Tampa, where it was left behind some bushes in a trash dump. Petitioner and Snell then continued their odyssey southward to the Florida Keys, and thence north along the east coast of Florida. They were apprehended for unrelated offenses in West Palm Beach, but upon discovering blood in the trunk of the car police officers there

---

*The question of whether Schneble's sentence of death in this case violates the Eighth and Fourteenth Amendment proscription of "cruel and unusual punishment" is therefore not at issue here. That question is currently under consideration in *Aikens* v. *California,* No. 68–5027, and companion cases. All executions in Florida have been stayed by the Governor's executive order until July 1, 1973. See Fla. Exec. Order No. 72–8 (Feb. 21, 1972).

commenced the investigation that ultimately led to the charging of petitioner and Snell with the murder of Mrs. Collier.

The investigating officers testified at the trial that petitioner initially, while admitting knowledge of the murder, claimed that Snell had shot Mrs. Collier while petitioner was away from the car taking a walk. Petitioner later conceded, however, that his earlier story was false. He admitted to the police that it was he who had strangled Mrs. Collier, and that Snell had finally shot her in the head as she lay dying. The state court held these admissions of petitioner to be voluntary and admissible. Since our grant of certiorari here was limited to the *Bruton* issue, our treatment of that question assumes that these admissions were properly before the trial court.

One of the investigating officers also related at trial a statement made to him by Snell. Petitioner challenges this testimony as violative of *Bruton,* since Snell did not take the stand and thus was not available for cross-examination. According to the testimony of this officer, Snell said petitioner had occupied the rear seat of the car and had never left Snell alone in the car with Mrs. Collier during the trip. While Snell's statement fell far short of the type of comprehensive and detailed confession made by petitioner, it did tend to undermine petitioner's initial (but later abandoned) claim that he had left Snell alone during the time at which the murder occurred. Snell's statement also placed petitioner in the position in the car from which the victim could more easily have been strangled. Thus, petitioner claims, the introduction of Snell's out-of-court statement, not subject to effective cross-examination, deprived petitioner of his right of confrontation in violation of *Bruton.*

The Court held in *Bruton* that the admission of a confession of a codefendant who did not take the stand deprived the defendant of his rights under the Sixth

Amendment Confrontation Clause, when that confession implicated the defendant. Even when the jury is instructed to consider the confession only against the declarant, the Court in *Bruton* determined that the danger of misuse of the confession by the jury was too great to be constitutionally permissible. *Bruton* was held to be retroactive in *Roberts* v. *Russell,* 392 U. S. 293 (1968), and thus applies to the instant case even though it was tried more than two years prior to *Bruton.*

The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

In *Harrington* v. *California,* 395 U. S. 250 (1969), the defendant was tried for murder jointly with three others. As in the instant case, he admitted being at the scene of the crime, but denied complicity. One of his codefendants, who confessed and implicated him, took the stand and was subject to cross-examination. The other two codefendants, whose statements corroborated defendant's presence at the scene of the crime, did not take the stand. Noting the overwhelming evidence of Harrington's guilt, and the relatively insignificant prejudicial impact of these codefendants' statements, the Court held that any violation of *Bruton* that had occurred was harmless error.

In the instant case, petitioner's confession was minutely detailed and completely consistent with the objective evidence. He informed police of the precise location at which they ultimately located the body, and guided them to this out-of-the-way spot. Although petitioner initially tried to put the sole blame on Snell,

this version of the facts did not satisfactorily explain certain deep rope burns on petitioner's hands. When confronted with the fact of the rope burns, petitioner admitted that he and Snell had plotted to kill Mrs. Collier in order to steal her money and the automobile.

Petitioner confessed that he had strangled Mrs. Collier with a plastic cord, and recounted the commission of the crime in minute and grisly detail culminating in Snell's shooting the victim in the head because she still showed signs of life after the strangulation. These details of petitioner's later account of the offense were internally consistent, were corroborated by other objective evidence, and were not contradicted by any other evidence in the case. They were consistently reiterated by petitioner on several occasions after his first exposition of them.

Not only is the independent evidence of guilt here overwhelming, as in *Harrington,* but the allegedly inadmissible statements of Snell at most tended to corroborate certain details of petitioner's comprehensive confession. True, under the judge's charge, the jury might have found the confession involuntary and therefore inadmissible. But this argument proves too much; without Schneble's confession and the resulting discovery of the body, the State's case against Schneble was virtually nonexistent. The remaining evidence in the case—the disappearance of Mrs. Collier sometime during the trip, and Snell's statement that Schneble sat in the back seat of the car during the trip and never left Snell alone with Mrs. Collier—could not by itself convict Schneble of this or any other crime. Charged as they were by the judge that they must be "satisfied beyond a reasonable doubt" and "to a moral certainty" of Schneble's guilt before they could convict him, the jurors could on no rational hypothesis have found Schneble guilty without reliance on his confession. Judicious ap-

plication of the harmless-error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face. See *Rogers* v. *Missouri Pacific R. Co.,* 352 U. S. 500, 504–505 (1957).

Having concluded that petitioner's confession was considered by the jury, we must determine on the basis of "our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury," *Harrington* v. *California, supra,* at 254, whether Snell's admissions were sufficiently prejudicial to petitioner as to require reversal. In *Bruton,* the Court pointed out that "[a] defendant is entitled to a fair trial but not a perfect one." 391 U. S., at 135, quoting *Lutwak* v. *United States,* 344 U. S. 604, 619 (1953). Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. See *Chapman* v. *California,* 386 U. S. 18, 24 (1967). In this case, we conclude that the "minds of an average jury" would not have found the State's case significantly less persuasive had the testimony as to Snell's admissions been excluded. The admission into evidence of these statements, therefore, was at most harmless error.

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

This is a capital case in which the petitioner was convicted of murder. When the case was last before us, we vacated the conviction and remanded for further consideration in light of *Bruton* v. *United States,* 391 U. S. 123 (1968). See *Schneble* v. *Florida,* 392 U. S. 298 (1968). On remand, the Supreme Court of Florida reaffirmed

the conviction, holding that it was not "inconsistent with Bruton." While *Bruton* itself received an extensive factual analysis by the State Supreme Court, little attention was paid to the facts of the instant case and no reasons were proffered in support of the holding that *Bruton* was not violated. In today's opinion the Court rejects the Florida Supreme Court's conclusion that this case can be squared with *Bruton* and concludes that *Bruton* was violated when the statement of a nontestifying codefendant implicating petitioner in the crime charged was introduced at trial. Yet, the conviction is permitted to stand because the *Bruton* violation is viewed as "harmless error" within the meaning of *Chapman* v. *California,* 386 U. S. 18, 24 (1967). I dissent.

Determining whether or not a constitutional infirmity at trial is harmless error is ordinarily a difficult task. This case is easier than most, because it is impossible to read the record and to conclude that the evidence so "overwhelmingly" establishes petitioner's guilt that the admission of the codefendant's statement made no difference to the outcome.

The Court relies on *Harrington* v. *California,* 395 U. S. 250 (1969), to support its conclusion, but that case is inapposite. In *Harrington,* the Court found harmless error where statements of two nontestifying codefendants were introduced at trial to demonstrate Harrington's presence at the scene of the crime. That decision was limited to a factual setting in which the defendant admits being at the scene, and the improperly admitted statements of the codefendants are merely cumulative evidence. I most urgently protest the extension of that case to these facts.

It is true that prior to trial petitioner confessed to murdering the victim. But, it is also true that when he was first arrested, petitioner denied his guilt and

placed the full blame on his codefendant. He also denied being present when the murder was committed. Only after he was subjected to a series of bizarre acts by the police designed to frighten him into making incriminating statements did petitioner "confess." The full spectrum of events leading up to the confession is set out in detail in the first opinion of the Supreme Court of Florida, 201 So. 2d 881, 884–885 (1967).

Petitioner moved to suppress the statements that he made to the police on the ground that they were the direct result of police coercion. Recognizing that the police acted improperly in attempting to obtain a statement from Schneble, the Florida Supreme Court upheld the trial court's finding that the incriminating statements were made in circumstances sufficiently attenuated from the coercive activities as to remove the taint. Our limited grant of certiorari does not permit review of this ruling. But, the limited nature of the grant does not bar us from looking at the entire record in the case in order to dispose of the one issue presented.

Before the trial judge permitted the jury to hear testimony regarding petitioner's incriminating statements, he made the initial determination that those statements were voluntary as required by *Jackson* v. *Denno,* 378 U. S. 368 (1964). He subsequently instructed the jury in the following manner:

"Should you find from the evidence that any alleged statement or confession as to any defendant was not freely and voluntarily made, or if you have a reasonable doubt in this regard, then you must disregard the same, as well as any other item of evidence that may have been discovered by the State by reason of such alleged statement of [*sic*] confession." (Tr. 561.)

We have no way of knowing what judgment the jury made with respect to the voluntariness of petitioner's

statements. In my opinion, there is clearly enough evidence to support either a finding of voluntariness or one of coercion. Since an error cannot be harmless if there is a reasonable possibility that it contributed to a finding of guilt, all reasonable inferences that might be drawn from the evidence must be drawn in favor of the defendant, since the jury may very well have made just these inferences. Thus, we can assume that the jury found petitioner's incriminating statements to be involuntary.

We must also assume that the jury followed the instructions of the court and disregarded not only the statements themselves, but all the evidence "that may have been discovered by the State by reason of such . . . statement[s] . . . ." It is possible that the jury may have found the statements to be involuntary and still relied on them. See *Jackson* v. *Denno, supra*. But, it is by no means certain that the jury did not meticulously follow the instructions of the trial judge. See *Lego* v. *Twomey,* 404 U. S. 477 (1972). Since either assumption may be made, we must again choose the assumption favorable to the defendant in order to insure that any error was harmless.

Assuming, then, that the jury completely disregarded petitioner's incriminating statements and all evidence derived therefrom, little evidence remains to support the verdict. Only the statement of the codefendant places petitioner at the scene of the crime at the relevant time. Without this statement, it is difficult to believe that anyone could be convinced of petitioner's guilt beyond a reasonable doubt.

The Court asserts, however, that "we must determine on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury,' . . . whether Snell's [the codefendant's] admissions were sufficiently

prejudicial to petitioner as to require reversal." The Court concludes that "the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to Snell's admissions been excluded."

The mistake the Court makes is in assuming that the jury accepted as true all of the other evidence. The case turns on this assumption, and as demonstrated above, it is clearly erroneous. The jury was given the duty of making an independent determination of the admissibility of petitioner's incriminating statements and their fruits. In light of the evidence with respect to coercive police activities, we cannot say with even a minimal degree of certainty that the jury did not find the statements involuntary and that it did not choose to disregard them and almost all of the other evidence in the case which was derived from those statements. We also cannot be certain that the jury did not base its verdict primarily on the statement of the codefendant. See *Malinski* v. *New York,* 324 U. S. 401, 404 (1945); cf. *Rogers* v. *Richmond,* 365 U. S. 534 (1961) (Frankfurter, J.).

The Court would assume that the jury must have found petitioner's statements to be voluntary and therefore admissible along with their fruits, because the other evidence was insufficient to support a conviction. This assumption is erroneous for several reasons. First, the jury may have found that some of petitioner's statements were involuntary and some were voluntary. The "voluntary" statements may have been connected with the codefendant's statement to support the conviction, while standing alone they may have been insufficient to support a guilty verdict. Second, the jury may have found that the statements were all involuntary but that some evidence remained free from any taint. Whereas the Court indicates that if the statements were involun-

tary, then all the other evidence in the case except the codefendant's statement must be suppressed as a matter of law, the jury was given only a general instruction on suppression and may, incorrectly and unwittingly, have more narrowly circumscribed the taint. The codefendant's statement bolstered any other evidence considered by the jury. Third, the jury may have found the statements to be involuntary and ignored all the evidence that the Court says should have been ignored. The jury may then have convicted on insufficient circumstantial evidence, including the codefendant's statement. We need ascribe no malevolence here; we need only recognize that humans err. Indeed, the very notion of "harmless error" should constantly remind us of that.* Any one of these things is a reasonable possibility, and despite the apparent certainty with which the Court affirms the decision below, there remains a deep and haunting doubt as to whether a constitutional violation contributed to the conviction.

In light of these uncertainties I find it impossible to perceive how the Court can conclude that the violation of *Bruton* was harmless error. It is significant that the Florida Supreme Court did not find harmless error in this case. Unless the Court intends to emasculate *Bruton, supra,* or to overrule *Chapman* v. *California, supra, sub silentio,* then I submit that its decision is clearly wrong.

---

*Rogers* v. *Missouri Pacific R. Co.,* 352 U. S. 500 (1957), cited by the Court to support the proposition that we do not lightly infer irrational jury behavior had nothing whatever to do with a criminal case generally or with "harmless error" in particular. That case dealt with the proper function of judge and jury in Federal Employers' Liability Act cases. It never considered whether reversal was required when evidence was admitted in violation of the Constitution. *Rogers* was, in short, a case involving the sufficiency of the evidence. In such cases we draw precisely the opposite inferences as drawn in "harmless error" cases.