**UNITED STATES of America ex rel. Abraham SIEGEL, Appellant,**

v.

**William M. LENNOX, Sheriff of the County of Philadelphia.**

**No. 71-1763.**

United States Court of Appeals, Third Circuit.

Argued April 13, 1972.

Decided May 19, 1972.

Stanford Shmukler, Philadelphia, Pa., for appellant.

T. Michael Mather, Asst. Dist. Atty., Milton M. Stein, Asst. Dist. Atty., Chief, Appeals Div., James D. Crawford, Deputy Dist. Atty., Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., Philadelphia, Pa., for appellee.

Before McLAUGHLIN, VAN DUSEN and ALDISERT, Circuit Judges.

ALDISERT, Circuit Judge.

This appeal from the denial of a petition for habeas corpus contends that Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), requires the granting of the writ because a co-defendant's extrajudicial statement was improperly admitted against appellant in their joint Pennsylvania state trial for cheating by false pretense.

In 1964 and 1965, the Attorney General of Pennsylvania conducted a special probe of the Philadelphia Magistrate Courts. In a prosecution emanating from that investigation, appellant, a duly elected Constable of the City of Philadelphia, was convicted in April, 1966, on four indictments charging cheating by false pretense.[1] Co-defendant Harry Schwartz, a Philadelphia Magistrate, was convicted of cheating by false pretense, conspiracy, and malfeasance in office. Motions for new trial were denied and, on September 14, 1967, the Superior Court of Pennsylvania unanimously affirmed the judgments of sentence.[2] While appeal was pending before the Supreme Court of Pennsylvania, the United States Supreme Court handed down its decision in *Bruton*, upon which appellant relied in asserting for the first time the impropriety of the use against him of an unsworn, extrajudicial statement given by Schwartz to the Attorney General's investigators.[3] The statement revealed the corporate structure and method of operation of a collection agency which Schwartz had established in 1954. It detailed appellant's

---

1. Appellant was also convicted on one bill charging conspiracy. Because the district court granted habeas corpus relief as to that charge, however, the conspiracy count is not before us on this appeal.

2. Commonwealth v. Schwartz, 210 Pa. Super. 360, 233 A.2d 904 (1967).

3. *Bruton* was held fully retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968), thus permitting appellant to raise this issue in the Pennsylvania Supreme Court.

involvement with the business, both prior to and during his term as Constable. The Pennsylvania Supreme Court, without opinion, affirmed appellant's convictions by an equally-divided court.[4] Appellant timely filed a petition for habeas corpus relief in the Eastern District of Pennsylvania,[5] which was denied, as to the false pretense convictions, by Judge Joseph S. Lord, III. This appeal followed.

Putting aside the Schwartz statement, the evidence at trial disclosed the following: Schwartz was elected Constable in 1954, and in the same year he established the Active Collection Agency. Six years later he was appointed Magistrate. In that same year he caused Active to be incorporated, having his wife as President, and appellant, a Constable since 1958 and whom Schwartz had appointed as Deputy Constable in 1955, as Treasurer.

The Philadelphia Credit Bureau, which attempted to collect overdue bills on behalf of member stores, would refer delinquent accounts either to Active or directly to a Constable to process collection. Philadelphia frequently referred such accounts to appellant directly. In return for collecting on the accounts, appellant would receive a fixed percentage —usually 23%—from Philadelphia. No interest or other amount was ever authorized to be added to the charges appellant was to collect. The arrangement called for appellant to submit to Philadelphia the face amount in which the account was delinquent; subsequently, Philadelphia would remit the commission to appellant. Other creditors, such as the Lavino Shipping Company, had a direct arrangement with Active, in which appellant was authorized to collect the account, deduct his commission, and remit the balance to the creditor. Similarly, in such cases no additional charges or interest were authorized. Appellant's mode of collecting these accounts was summarized by the Superior Court:

> On numerous occasions defendant Siegel made improper service of the summons, improper service of execution and levy, or failed to make a levy of any kind, and filled in as standard practice identical descriptions of property levied upon his returns. In the cases proved, certain amounts of money were added, which were pocketed by the collection agency and not paid to the creditor. Siegel also added mileage fees without regard to actual mileage, notwithstanding that the "service" was often improperly made. In addition, in each case costs were imposed of $7.50 or $9.00, in direct contravention of the statutory fee of $2.50.

> \*   \*   \*   \*   \*   \*

> The pattern of Siegel's conduct was that he would receive an IBM card or notice of claim with the name and address of the debtor, the amount of the real debt and the date of the last communication or payment by the debtor. Siegel would then add to the claim an arbitrary sum for interest and in some cases, without explanation, increased the amount of the real debt. A summons was then made out by Siegel and, after issuance by Magistrate Schwartz, service was made, often by mail rather than personally, as required by law, and on some occasions the summons was never actually served. This was followed by the entry of judgment by Schwartz in favor of the creditor.

> \*   \*   \*   \*   \*   \*

> After judgment was entered, Schwartz permitted Siegel to send out writs of execution under his, Mr. Schwartz' name, but Schwartz never followed up Siegel's actions. Siegel's levies were uniform in their impropriety—notices of levy and inventory

---

4. Commonwealth v. Schwartz, 432 Pa. 522, 248 A.2d 506 (1968). Justice Musmanno died prior to decision in the case, leaving the court equally divided in affirmance, 3–3. In a dissent in which Justice O'Brien joined, Justice Roberts contended that *Bruton* required that Siegel be granted a new trial.

5. Schwartz also filed a habeas petition, but died prior to disposition. His action was abated.

of goods levied upon were prepared in Siegel's office and were all virtually identical. Notices were either mailed to the debtor or left in the debtor's mailbox, without entry into the debtor's home. Siegel claimed and collected fees for this service which was improperly performed, and the fees claimed and collected did not conform to the statutory fee bill. The various creditors did not ask that interest be added or collected, and never received more than the real debt. The creditor sometimes received less than the real debt even though it was actually collected in full.

Commonwealth v. Schwartz, 233 A.2d 904, 909–910 (1967).

In addition to presenting evidence of the foregoing *modus operandi,* the prosecution read into the record excerpts from a statement given by Schwartz to Philadelphia District Attorney Arlen Specter and to Special Assistant Attorney General John Mason. The parties agreed that the statement was not admissible against appellant, and prior to the reading from the statement the court so instructed the jury.[6] Only a few portions of the statement related to appellant:

Q. Is there an underlying arrangement between Mrs. Schwartz and Constable Siegel for division of the profits in a more or less partnership arrangement or what is the arrangement there, if any?

A. Mr. Siegel came to work for me in September 1953. At the magnificent sum of or munificent of $50 per week. And when I became Magistrate his—I'll tell you the truth, his salary went up in leaps and bounds because that was terrific salvation not only to myself but to every member of my family, and I don't restrict it to 9:00 to 5:00. I mean twenty-four hours a day seven days a week. Today since I became a Magistrate that man has fifty percent of the profits.

Q. Does he hold—but he doesn't hold fifty percent of the stock?

A. No sir. It's truly what you call a Horatio Alger story from $50 a week up to about $20,000.

\* \* \* \* \* \*

Q. Abe Siegel really runs the business?

A. Abe Siegel really runs the business. There's no question abut that, sir.

\* \* \* \* \* \*

Q. What is your practice with regard to having the amount of the debt and the costs noted on the summons? I notice in some instance in other cases they are noted, but in none of these is there any indication on the summons itself of the amount of interest on the debt and costs.

A. Well, it is just a collection gag, that's all. There are two ways. You either don't exhibit the correct amount or you exhibit a greater amount than what they owe. You have to get a reaction. You want to collect money. If you're working for a percentage that's the way you collect money.

\* \* \* \* \* \*

A. (Interposing) Siegel gets the Bell Telephone Company cases. It isn't the Active Collection Agency because the Philadelphia Credit Bureau has a collection agency. They don't give the claims to Active, they give them to the constable. And do you want to know something? They still mention it to me. I'm the one that's going to be responsible if anything goes wrong because they trust me.

\* \* \* \* \* \*

Q. (Continuing)—at what point of time is the—at Bell Telephone or PCB or Siegel is the determination made to

---

6. The court charged:
   Members of the jury, it is agreed that this transcript with the information contained in the transcript may not be considered or used in any respect as against Constable Siegel, even though Constable Siegel's name may appear from time to time in it. Now there is just no question about it, everybody agrees that he is not bound by it, and it can't be used against him. It is not a part of the evidence in the case against Constable Siegel.

add interest to the phone company bill?

A. Well, the fact that they add interest is merely to try to collect the claim. They make the claim greater than what it is by the addition of interest. The fact that the interest may or may not be collected you're not interested in.

Q. Well, what I want to know is which entity determines that the interest is to be tacked on to make that claim more collectible?

\* \* \* \* \* \*

A. It's Siegel's office that adds on the interest. But I repeat, you do not know whether that interest is collected or not.

Q. Would it surprise you, sir, to find out that in many instances—

A. (Interposing) They are collected?

Q. (Continuing)—interest is collected?

A. Yes, sir. I'm not surprised. I'm not surprised.

\* \* \* \* \* \*

A. It's a peculiar thing, regardless of what I say, I'm going—whether its a violation of the Act, the Magistrate's Act or not, I don't know. Some say yes, some say no. I handle all this business for one reason. If my wife makes money, I'm going to benefit by it because I have an opportunity to spend some of the money she makes, being president of the company that employs the Constable who handles the work.

█ To support a conviction for false pretense under Pennsylvania law, the Commonwealth must prove three elements: (1) false representation; (2) the obtaining of property or something of value; (3) intent to defraud. Commonwealth v. Buzak, 197 Pa.Super. 514, 179 A.2d 248 (1962); Commonwealth v. Petrosky, 194 Pa.Super. 94, 166 A.2d 682 (1960). Appellant concedes that the evidence demonstrated both the misrep-

resentation and the acquisition of something of value thereby. The primary contention advanced on this appeal, however, is that evidence of intent to defraud is presented only in the Schwartz statement. This, appellant argues, "was the damning proof of intent not otherwise evinced by the Commonwealth which fulfilled the Commonwealth's burden to the jury." From this conclusion, appellant forges a two-pronged attack: first, the statement was admitted in violation of *Bruton*; second, because it was the only proof of intent, it could not be deemed harmless error to admit it.

We have substantial doubt that admission of the Schwartz statement constituted a violation of *Bruton*. Surely it could not, by any measure, be deemed a confession. Schwartz there admitted to no wrongdoing on his own part, nor did he inculpate anyone else, including appellant. His account bespeaks of successful business enterprise and commercial ingenuity, not of criminality. We find nothing of the "powerfully incriminating" nature which compelled the *Bruton* court to overrule Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), with which the trial court here complied by issuing clear, contemporaneous limiting instructions. Indeed, we are inclined to agree with the court below that "[t]he Schwartz statement, if it did anything, provided a basis for finding that there really was *no* intent to defraud, but rather that the addition of interest was merely a lever to collect the debt."

Appellant contends, however, that the underlying rationale of *Bruton* is manifestly applicable here: *Bruton* is partially premised on the notion that a jury is not likely to be able to separate its consideration of inculpatory evidence against one defendant while ignoring that evidence against another, irrespective of instructions to do so.[7] Here, the district court found that habeas relief

---

7. Justice Brennan's opinion for the Court in *Bruton* quotes approvingly from the dissent by Justice Frankfurter in *Delli*

*Paoli*, in which three other justices joined:

> That dissent challenged the basic premise of *Delli Paoli* that a properly

was required under *Bruton* as to the conspiracy count, but not as to the false pretense charges. By analogy, appellant urges that the jury could not have had the capacity to differentiate between the inadmissibility of the statement in the conspiracy charge and its admissibility on the false pretense counts, thus considering it for one charge against appellant but not for the other.

■■ In the view we take of this case, however, it is unnecessary for us to consider the import of this argument. We hold that, even assuming the admission of the statement contravened *Bruton*, the error was harmless beyond a reasonable doubt. As the Supreme Court recently held in Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L. Ed.2d 340 (1972):

The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial

effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

This is such a case. Representatives of four creditors testified in detail as to the working relationship their companies employed in dealing with appellant, either as an individual or as Active Collection Agency. Specific accounts were referred to, on which appellant was authorized to recover the face amount of the debt only. Testimony revealed that no additional charges of any kind which may have been collected by appellant were ever passed on to the creditor. The individual victims of appellant's scheme took the stand—no fewer than fifteen in all—and testified as to the manner in which appellant contacted them and how, by the apparent power of his position, he explained how much they had to pay. An undeniable pattern emerges, in which the amount actually paid substantially exceeded the original debt by the addition of illegal extra charges, interest and costs.[8] A Special

---

instructed jury would ignore the confessor's inculpation of the nonconfessor in determining the latter's guilt. "The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors.

The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell." 352 U.S. at 247, 77 S.Ct. at 302.
*Bruton, supra*, 391 U.S. at 129, 88 S.Ct. 1620, 20 L.Ed.2d 476.

8. Explanations for the increases were sometimes given, but often were not. The testimony revealed the following discrepancies:

| Witness | Creditor | Amount Owed | Amount Paid |
| --- | --- | --- | --- |
| Eisley | Telephone Co. | $ 32.55 | $ 49.05 |
| Ford | Lavino Shipping | 14.36 | 38.96 |
| Smith | Telephone Co. | 43.81 | 60.00 |
| Huston | Telephone Co. | 37.91 | 54.41 |
| Witts | J. C. Penney | 105.36 | 129.00 |
| Granoff | Wm. Penn Shop | 25.00 | 36.50 |
| Dunn | Sears | 24.50 | 44.50 |
| Gray | Strawbridge | 32.20 | 57.00 |
| Cybulski | Gimbel's | 18.46 | 33.96 |
| Speller | J. C. Penney | 23.55 | 39.00 |
| Crockin | Atlantic Refining | 23.61 | 31.61 |
| Roane | Howard Clothes | 38.25 | 62.45 |
| Woolfork | Telephone Co. | 39.60 | 70.90 |
| Gault | | 95.00 | 127.30 |

Witness Mayall testified that when she paid $35.00 of $38.00 owed, appellant raised the bill to $63.60, including an arbitrarily increased principal of $43.00; $2.50 in interest; $7.50 in costs; and $10.60 in levy. She refused to pay it.

Agent for the Pennsylvania Department of Justice testified, after measuring the distances involved, as to the exorbitant and fictitious mileage charges which appellant arbitrarily added to debtor's costs.

We have conducted "our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury," Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), we conclude that the Schwartz statement was, at most, mildly corroborative of the plethora of evidence which firmly demonstrated all the elements of the crime, including intent.[9] Thus, even assuming the impropriety of admitting the Schwartz statement, we hold that "there is [no] reasonable possibility that the improperly admitted evidence contributed to the conviction," Schneble v. Florida, 405 U.S. at 432, 92 S.Ct. at 1060.

◼ We reject appellant's remaining contention that affirmance of his convictions by an equally-divided Supreme Court of Pennsylvania violated his rights under Article V, § 2 of the Pennsylvania Constitution, P.S., which provides that the Supreme Court of Pennsylvania shall "consist of seven judges." The notion that a full court is required for disposition of an appeal flies in the face of 17 PA.STAT.ANNO. § 10, which permits a majority of the state supreme court to hold court. Appellant has suggested no authority for the proposition that a "constitutional majority" of the court must act to affirm a criminal conviction, and we have found none. The practice of affirming by an equally divided court is commonplace not only in the Pennsylvania Supreme Court, but also in this court [10] and in the United States Supreme Court.[11]

◼ Indeed, no other action would be possible when an appellate court, because of death, illness or recusal, must dispose of a case before it where there is a quorum present, but no majority in agreement as to the disposition of the appeal. As the Supreme Court of Pennsylvania recognized long ago, where the court is equally divided, "the rule in such cases is that no valid order or decree can be made. If there is a motion before the court it falls. This is the rule everywhere, and it requires no argument to vindicate it. The only order we can make in such a case is to affirm the judgment or decree of the court below. . . . An affirmance here by a divided court means merely that the judgment or decree below cannot be disturbed." Appeal of Madlem, 103 Pa. 584 (1883).

Accordingly, the judgment of the district court denying the petition for habeas corpus will be affirmed.

9. In Commonwealth ex rel. Garrison v. Burke, 378 Pa. 344, 106 A.2d 587 (1954), the Supreme Court of Pennsylvania said: Intent may be inferred from action as well as words. Commonwealth v. Ellis, 349 Pa. 402, 404, 37 A.2d 504. It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt.

10. See, e. g., United States v. Joseph, 438 F.2d 1233 (3d Cir. 1971), in which this court, consisting of nine judges en banc, heard an appeal from a draft conviction. Judge Freedman died before the case was decided, and the remaining eight judges were equally divided on the merits. A per curiam opinion was filed: "On this appeal the court is evenly divided. The judgment will be affirmed."

11. See, e. g., Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968).