UNITED STATES of America
ex rel. Peter BUTLER,
Relator,

v.

Theodore SCHUBIN, Superintendent, Ossining Correctional Facility, Ossining,
New York, Respondent.

No. 73 Civ. 4215.

United States District Court,
S. D. New York.

April 24, 1974.

Peter Butler pro se.

Frank S. Hogan, Dist. Atty., New York County, New York City, for respondent; Robert A. Goldschlag, Asst. Dist. Atty., of counsel.

OPINION

EDWARD WEINFELD, District Judge.

Petitioner, Peter Butler, presently serving a life sentence at the Ossining Correctional Facility, Ossining, New York, imposed on June 15, 1967, pursuant to a judgment of conviction for the crime of murder in the first degree, following a jury trial in the Supreme Court, New York County, seeks his release upon a writ of habeas corpus. He alleges his federally protected constitutional rights to due process of law under the Fourteenth Amendment and under the confrontation clause of the Sixth Amendment were violated by (1) the failure of the prosecution to turn over tape recordings of conversations between a prosecution witness and Richard Conroy, petitioner's codefendant; and (2) the admission in evidence of out-of-court statements attributed to his codefendant who did not testify.

Petitioner's conviction was affirmed by the Appellate Division, First Department, on November 20, 1969,[1] and thereafter unanimously upheld by the New York Court of Appeals.[2] The State acknowledges that petitioner has exhausted available state remedies.

The crime for which petitioner and his codefendant were convicted was committed on the evening of April 14, 1964. The victim was Charles J. Gallagher, a Columbia University physics professor, who was found early the next morning in Central Park, in an area known as the "Rambles," with a bullet in his heart. There were no eyewitnesses to the homicide. Petitioner and Conroy were arrested two years later and charged with the murder. The theory of the prosecution was that Butler and Conroy went to Central Park the evening of the murder for the purpose of robbing homosexuals, and in the course of their mission committed the murder. The evidence against petitioner and his codefendant consisted principally of admissions made by each to various friends who were called as prosecution witnesses.

The evidence offered by the State established that within several hours after the commission of the crime, Butler and Conroy went to a bar in Brooklyn where they related the circumstances of the murder to William R. Rachun, a bartender. Butler and Rachun had been friends for twelve years; Rachun knew Conroy for about two years, having met him through Butler. Rachun testified that, in the presence of Conroy, Butler detailed events of the crime. Butler said he and Conroy had gone into Central Park to roll some "queers"; he picked up the decedent, went into the bushes with him, pulled a gun and demanded money. The victim resisted; a struggle ensued, the gun went off discharging a bullet and the victim fell to the ground. As the two defendants ran out of the park, Conroy advised Butler to throw the gun into the lake, but he did not do so. Butler displayed to Rachun powder burns on his right hand, which he tried to wash off. He also showed Rachun the murder weapon, a .25 caliber Italian-make automatic pistol which Butler had obtained about a month previously from Rachun. The three men discussed destruction of the weapon. Rachun supplied a hammer and screwdriver, which Conroy used to take apart the gun and mutilate its pieces. All three left the bar at about midnight and proceeded to Newton Creek in Rachun's car; there the pieces of the weapon were thrown by Butler into various sections of the creek. They then left the area and agreed no mention should be made of the incident. The next day Butler telephoned Rachun and asked if he had read any of the press accounts of the murder. When Rachun replied he had, Butler disputed a version which described the decedent as a bird watcher. Thereafter, on several occasions Butler admonished Rachun to keep quiet.

Rachun was first questioned by police authorities in August 1966, almost two and a half years after the murder, when he was in military service. At first he denied knowledge of the killing, but on the second day acknowledged the matters to which he testified upon the trial. This was after he was promised immunity as an accessory after the fact. Also, he admitted Butler owed him $1,000, which he asked for on various occasions but did not receive; he denied ever threatening Butler about its repayment. Rachun further acknowledged he was a bookmaker at the time of the events in question.

Timothy Kraft, also a friend of both Butler and Conroy, testified that he read newspaper articles about the killing of a Columbia University professor in

1. People v. Butler, 33 A.D.2d 675, 305 N.Y. S.2d 367 (1969). A decision on Conroy's appeal was withheld and the case remitted for an evidentiary hearing. After the hearing, the Appellate Division also affirmed his conviction, and the case is now pending in the Court of Appeals.

2. People v. Butler, 28 N.Y.2d 499, 318 N.Y. S.2d 943, 267 N.E.2d 587 (1971).

Central Park. Several days later, while outside the Port Authority Terminal in New York City waiting for a friend, he accidently met Butler, who, after some casual conversation, asked if Kraft heard about the killing of the professor; when he responded affirmatively, Butler said, "It was me, I did it." When Kraft expressed skepticism, Butler answered he was not "kidding." Kraft asked Butler why he did it and the latter responded that the victim was a homosexual whom he was trying to "roll," and that a struggle had ensued during which he killed the professor. Butler went inside the terminal to purchase cigarettes but returned within a few minutes and told Kraft he had been only "kidding."

Kraft admitted he was a gambler; also, that he had been convicted of statutory rape, as a misdemeanor, and of the unauthorized use of a motor vehicle. He further testified that the first time he told anyone about the incident was in September 1966, which was soon after Conroy had been arrested and his picture appeared in the newspaper. He then made the information available to police officers, who called at his home. Kraft, who was questioned in the presence of his mother and wife, at first denied any knowledge of the case, but upon further questioning, and after talking to his mother, finally gave the police officers the information as to which he testified upon the trial. He acknowledged that one of the reasons he furnished the information was that he had heard (from sources other than the police) that Butler had "ratted on Conroy."

Dale Owen Tron, a friend of Conroy, testified that early in 1965 Conroy asked if he recalled the killing of Professor Gallagher the year before in Central Park. Conroy gave details of the crime, stating that he and Butler had gone to the park and that Butler had taken Professor Gallagher aside and shot him;[3] that Butler had panicked and wanted to throw the gun into the lake in Central Park but that Conroy stopped him; that instead they took the gun elsewhere, broke it up and threw it into a creek. Conroy said the gun was a .25 caliber Bernadelli automatic. Later that summer, the witness drove with Conroy and Ronald Haake to Central Park, where Conroy pointed out a wooded spot to Haake. Tron further testified that in the fall of 1965 he told Butler what Conroy had told him about the killing in the park, whereupon Butler replied, "Jesus Christ, can't he ever keep his mouth shut about anything."

Ronald M. Haake, at the time of the trial a 2d Lieutenant in the United States Army, knew both defendants. He testified that Conroy, in May or June 1965, after asking him if he could keep a secret, told him that Butler and he had gone into Central Park "to do a mugging"; that Butler lured a man into the bushes, got nervous and shot him; that they then went to a bar where they broke up the pistol, and later threw the pieces into Newton Creek. Soon thereafter Conroy, he and three or four others were in Central Park, adjacent to West 70th Street, and Conroy pointed it out as the place where the killing was committed. Later that year, in December 1965, Haake testified that while riding in a truck with Butler and Howard Hillowitz, the subject came up that Butler and Conroy had killed the professor, whereupon Butler asked of Haake, "Conroy told you that?" When he responded affirmatively, Butler said Conroy "has a big mouth"; that Conroy was so scared after the murder he was running around in circles; that he wanted to keep the gun but Conroy would not let him.

Haake admitted that he had an argument with Butler over Lynn Richardson. Also, he admitted that several months prior to the trial, he had lied to defense counsel when he denied he had given a statement to the District Attorney.

3. The jury was instructed that this testimony was not to be considered as evidence against Butler, an instruction which was given and underscored whenever evidence was offered as to declarations by Conroy outside the presence of Butler.

Howard Hillowitz testified as to inculpatory statements made by both Conroy and Butler, but on different occasions. He testified that he had known Conroy seven years and Butler three years. One day in June, 1964, Conroy asked him if he remembered reading in the newspapers about a professor who had been killed in Central Park. Hillowitz replied that he did and that the papers mentioned it involved espionage and that the Russians might have killed the professor. Conroy said it was not espionage and that news accounts also were wrong in reporting that the professor was shot with a .22 caliber gun; that it was a .25 caliber. Conroy then told him the professor was killed by Peter Butler, the "guy" they were to meet that night. When Hillowitz asked Conroy how he knew of the killing, Conroy responded he was there with Butler; that a "queer" had walked by and made a pass at Butler, which Butler did not like, and he pulled the man over to the side and shot him. Later that night Hillowitz met Butler for the first time.

The subject of the killing of the professor came up again in December 1965, when Hillowitz was with Ronald Haake, whose testimony has already been referred to. Hillowitz's testimony on this incident is substantially in accord with Haake's. Hillowitz testified that Butler entered the diner where he was with Haake and said that he had heard that Conroy had been shooting off his mouth about him. Butler further said that he had to find Rachun immediately. Haake, Hillowitz and Butler proceeded by truck to locate Rachun. En route, Butler repeated that he heard Conroy had been spreading word around that he killed the professor in Central Park. Thereupon both Hillowitz and Haake acknowledged that they had been told that by Conroy, with Hillowitz adding, "In fact, Conroy said you were the one that shot him," whereupon Butler said that when he found Conroy he was going to "break his ass."

Hillowitz admitted having sexual relations with Lynn Richardson, but denied either Butler or Conroy ever told him to stay away from her.

Lynn Richardson was the last person in point of time to whom Butler made an admission as to the murder. She testified that she lived with him from December 1965 until June 1966. During this period she was about 17½ years of age. About the middle of January 1966, Butler told her that he and Conroy were in Central Park to "roll someone"; that a man came out of nowhere and approached him; that he, Butler, drew a gun on him; that Conroy was not then in sight; that Butler and the man began to struggle and the gun went off, the man falling to the ground; that Butler and Conroy went to Rachun's bar in Brooklyn, where they got rid of the gun; further, that Butler told her he called Conroy and Rachun the next day and asked them to look at the newspaper headlines about the professor being killed in Central Park; also, that Butler told her that the area of the park they walked in was in the upper Seventies.

Richardson further testified that when she was first questioned about the case on August 4, 1966, she denied knowing anything about it, but that after several hours, when the police told her they would make it hard for her if she did not cooperate, she admitted she knew something about the case. At first she lied, saying Butler told her the man in the park had a gun, but later informed the police that Butler told her he had the gun. Richardson was held as a material witness for two weeks. Cross-examination also developed that Butler had caused her arrest in March and June 1966 on prostitution charges, for which she was sentenced to twenty days in jail on each conviction. After serving her last sentence she never saw Butler again; however, she once wrote to him while he was in prison and he wrote to her.

Neither defendant testified on his own behalf, nor did any witness testify for the defense.

Against the background summary of the testimony of the six witnesses, we

consider petitioner's claim of constitutional infirmities on which he seeks to void the judgment of conviction.

Petitioner first contends that the admission in evidence of the out-of-court statements attributed to Conroy, his codefendant, who did not testify at the trial, was contrary to the rule of Bruton v. United States,[4] and thereby violated his right to confrontation of witnesses under the Sixth Amendment.[5] It is desirable to set this claim in proper focus by noting that no issue is, or can be, presented under *Bruton* as to the testimony of Rachun, Kraft and Richardson. Their testimony was based upon Butler's own admissions and declarations and were clearly admissible against him. So, too, in the instance of the other three witnesses, Tron, Haake and Hillowitz, each testified as to inculpatory statements independently made by Butler, the admissibility of which likewise cannot be questioned. However, the latter three witnesses also testified as to statements made by Conroy out of the presence of Butler incriminating him, and it is the admission of these statements upon which petitioner asserts error of constitutional dimension. Accepting under *Bruton* that Conroy's statements to those witnesses should have been excluded and their testimony confined solely to Butler's own statements, it does not follow that the error necessarily voids the judgment of conviction. Not every violation of the *Bruton* rule is a ground for reversal.[6] The Supreme Court has held that the mere finding of

a violation of the *Bruton* rule does not automatically void a conviction where "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." [7] In the instant case, as already noted, all six witnesses testified to statements made to them by Butler about the murder. It was Butler who volunteered to Rachun the principal and detailed information as to the murder, the place and the circumstances, all of which were consistent with the objective evidence. Butler, in Rachun's presence, tried to wash off the powder burns on his right hand, which was soon after the homicide; Rachun also testified that he helped Butler and Conroy dispose of the murder weapon after it had been mutilated and dismantled. In addition, Rachun identified the gun as a .25 caliber Italian automatic which previously he had loaned to Butler, the type of weapon that the State's ballistics expert testified was used to shoot Professor Gallagher. This evidence must be compared with the statements of Conroy admitted in violation of the *Bruton* rule; such statements were contained in portions of the testimony of Tron, Hillowitz and Haake. This testimony was not at variance with the statements that Butler himself had made to those witnesses. They not only interlocked with Butler's own admissions, but in each instance Butler thereafter made incriminating

---

4. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), made retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968).

5. In each instance when Conroy's statements were testified to, the court, following Delli Paoli v. United States, 352 U.S. 232, 77 S. Ct. 294, 1 L.Ed.2d 278 (1957), which was in effect when this case was tried, instructed the jury that Conroy's admissions were received only as against him and were to be disregarded in determining Butler's guilt or innocence. The instruction was repeated in the court's charge.

6. *See* Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harring-

ton v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); United States ex rel. Siegel v. Lennox, 460 F.2d 690 (3d Cir. 1972); United States ex rel. Ross v. La Vallee, 448 F.2d 552 (2d Cir. 1971); Metropolis v. Turner, 437 F.2d 207 (10th Cir. 1971); United States ex rel. Joseph v. LaVallee, 415 F.2d 150 (2d Cir. 1969), cert. denied, 397 U.S. 951, 90 S.Ct. 976, 25 L.Ed. 2d 133 (1970); United States ex rel. Dukes v. Wallack, 414 F.2d 246 (2d Cir. 1969).

7. Schneble v. Florida, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *see* Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

statements to those very witnesses entirely consistent with Conroy's statements. The only evidence that conceivably added anything to Butler's statements was the testimony of Haake that Conroy had pointed out in Central Park the murder site. Butler, however, told Rachun and Kraft that the site of the crime was Central Park; he told Richardson that the area in Central Park was in the Seventies, where Gallagher's body was found. Thus, the testimony that Conroy showed Haake the murder site is of little added significance when considered against the totality of the evidence properly admitted against Butler. Butler's statements and admissions coincided with those of Conroy and were entirely consistent with significant objective facts as to which only one who had participated in the murder would have knowledge, such as a description of the murdered victim; the location of the crime; that the decedent had an umbrella; the type weapon that was used; its dismantling at Rachun's bar, and its disposal in Newton Creek.

■ In the light of the overwhelming independent evidence of petitioner's guilt based upon properly admitted evidence against him at the trial, and considering that the allegedly inadmissible statements attributed to Conroy were merely corroborative of petitioner's own admissions, this court finds beyond a reasonable doubt that the use of the co-defendant's admissions was harmless error—indeed, the statements of each co-defendant so interlocked that they might be considered one and the same.[8]

Petitioner next contends that the failure of the prosecution to turn over to defense counsel tape recordings of telephone conversations between Lynn Richardson and petitioner's codefendant allegedly deprived petitioner of his right to effective cross-examination of Richardson and thereby violated his right to due process of law under the Fourteenth Amendment.

From the very start of the trial it was known to the defendants that wiretaps of the telephone conversations of one or both defendants had been obtained. They sought, in support of a motion to suppress, to examine the police, as well as the wiretap orders or the affidavits upon which they were based. The Assistant District Attorney represented that no evidence or leads had been obtained from the wiretaps and that no wiretap evidence would be offered at the trial. Before any evidence was introduced, a hearing was held; the trial judge, after examining the supporting affidavits in camera, decided they established probable cause and denied the defendants' motion.

In addition, before the taking of testimony, petitioner's attorney, citing Brady v. Maryland,[9] and Giles v. Maryland,[10] sought discovery of the report of the State's ballistics experts "in order to properly prepare for our cross-examination on our defense." The court denied the motion, but upon counsel's further request that the prosecution "turn over any and all other material [the District Attorney] may have concerning this investigation which will either aid the defendants in preparation of their defense or exculpate the defendants," the court inquired of the prosecutor if he knew of any such material, to which the latter replied, "Nothing that I am aware of."

As the trial proceeded, defense counsel, upon the completion of direct testimony by each prosecution witness, requested all prior statements of the witness. Thus, when Lynn Richardson fin-

8. *Cf.* United States ex rel. Ortiz v. Fritz, 476 F.2d 37 (2d Cir. 1973); United States ex rel. Duff v. Zelker, 452 F.2d 1009 (2d Cir. 1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134 (1972); United States ex rel. Sloan v. McMann, 415 F.2d 275 (2d Cir. 1969); United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296 (2d Cir. 1968),

cert. denied, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970).

9. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

10. 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

ished her direct testimony, petitioner's attorney requested "all prior statements made by this witness, if any, and the Grand Jury testimony, if there be any." In response, the prosecution delivered to the defense Richardson's grand jury testimony and portions of two detectives' notebooks containing prior statements made by her.

What was not turned over were tape recordings of conversations between Richardson and codefendant Conroy. It is claimed that they could have been used for cross-examination of Richardson to demonstrate her bias and hostility against the relator; that the failure to make them available constituted prosecutorial misconduct which deprived petitioner of his right to a fair trial.

Petitioner first contends that he was entitled to the withheld tape recordings under New York's rule enunciated in People v. Rosario,[11] generally considered to be the State's counterpart of the Jencks rule.[12] Under Rosario, a defendant is entitled to inspect only those prior statements of a witness which relate to the subject matter of the witness' testimony. The State argues that none of the conversations in which Richardson was a participant was related to the subject matter of her direct testimony.[13] The State also contends that the wiretap recordings are not "statements" within the meaning of Rosario, since the wiretapped conversations between Richardson and Conroy were not a recital of past occurrences by a witness to a law enforcement officer.[14] Petitioner challenges the State on both these points.

■ We do not tarry to resolve this dispute; the Appellate Division held that "the tapes, strictly speaking, did not relate to the subject of her testimony" and, further, that even if the denial of the tapes to petitioner was erroneous, it was harmless error.[15] Rosario is grounded in the State's common law, and if petitioner was wrongly denied tapes he was entitled to receive under that doctrine, no violation of federal constitutional rights is presented.[16] Thus, assuming the State courts were in fact in error in interpreting the scope of the Rosario rule,[17] it was one of state law that is not subject to review under a petition for a federal writ of habeas corpus charging infringement of federal constitutional rights.[18]

Petitioner next urges that the State's failure to provide him with the tapes

11. 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E. 2d 881 (1961).

12. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), subsequently codified in 18 U.S.C. § 3500.

13. But cf. United States v. Borelli, 336 F.2d 376, 393 (2d Cir. 1964), cert. denied, 379 U. S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), holding that a statement that would support impeachment for bias and interest "relates" to the witness' testimony under 18 U.S.C. § 3500. See also Rosenberg v. United States, 360 U.S. 367, 370, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959).

14. See United States v. Crisona, 416 F.2d 107, 112–114 (2d Cir. 1969), cert. denied, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970) ; United States v. Sopher, 362 F.2d 523, 525–526 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210 (1966) ; cf. United States v. Birnbaum, 337 F.2d 490, 497–498 (2d Cir. 1964).

15. People v. Butler, 33 A.D.2d 675–676, 305 N.Y.S.2d 367, 369 (1969); The New York Court of Appeals affirmed without opinion, 28 N.Y.2d 499, 318 N.Y.S.2d 943, 267 N.E. 2d 587 (1971).

16. Similarly, Jencks was decided under the Supreme Court's rule-making powers for the administration of justice in the federal courts rather than as a matter of federal constitutional law. See Palermo v. United States, 360 U.S. 343, 345, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

17. Cf. People ex rel. Cadogan v. McMann, 24 N.Y.2d 233, 236, 299 N.Y.S.2d 617, 619, 247 N.E.2d 492, 493 (1969).

18. United States ex rel. Sadowy v. Fay, 284 F.2d 426, 427 (2d Cir. 1960), cert. denied, 365 U.S. 850, 81 S.Ct. 814, 5 L.Ed.2d 814 (1961) ; United States ex rel. Murphy v. Denno, 234 F.Supp. 692, 695 (S.D.N.Y. 1964) ; United States ex rel. Birch v. Fay, 190 F.Supp. 105, 107 (S.D.N.Y.1961) ; see Buchalter v. New York, 319 U.S. 427, 429–430, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943).

constituted suppression of exculpatory material under Brady v. Maryland, and that this deprived him of the means of effective cross-examination of Richardson and of his federal constitutional rights to a fair trial within the due process clause. The State argues that petitioner did not specifically seek disclosure of the tapes and hence *Brady* does not come into play. I think this is a hypertechnical position, since petitioner did request at the start of the trial all exculpatory material or material that would aid the defense. However, accepting that a proper demand was made, the issue still remains whether the failure to turn over the tapes constitued such error of constitutional magnitude as to void the judgment of conviction.

Under *Brady* the test is whether the withheld evidence was material to the guilt or innocence of the accused. The simple fact is that in no respect do the tapes exculpate Butler of the crime charged, or include any material which tends to exonerate him. However, they do contain statements by Richardson and Conroy which tend to show bias or hostility on the part of both to Butler.[19] The transcripts indicate that Richardson wanted to see Butler serve time on a car theft charge, that she wanted to see him killed and that she would be willing to lie at a trial (unrelated to the Gallagher murder charge) at which she would plead guilty but falsely implicate Butler by testifying he had coerced her into committing the crime of forgery. Thus, while it contained no exculpatory or other evidence favorable to petitioner, it could have been availed of for further cross-examination of Richardson. Additionally, petitioner urges that the failure to make the tapes available for impeach-ment of Richardson was compounded by the prosecutor's summation, which characterized Richardson as a friend of petitioner and her testimony as an attempt to "protect" and "save" him.

At the outset we note there is no basis for any charge upon this record that the Assistant District Attorney deliberately withheld tapes whose high value to the defense could not have escaped his attention.[20] The wiretaps were unproductive insofar as the crime under investigation was concerned.[21] Their nature was such that the prosecutor could readily have overlooked the tapes as being of any significant use to the defense, since they touched upon matters not related to the crime charged against petitioner and his codefendant which then was under investigation. We assume, as petitioner contends, that *Brady* would require they be turned over, but it does not follow that plaintiff is entitled to relief. Richardson was vigorously cross-examined by petitioner's counsel. The jury knew she was a prostitute, that she was a dissolute person and that she led a sordid life. Further, it knew Butler had been responsible for at least one of her arrests and convictions for prostitution, which certainly tended to show her bias. As the Appellate Division put it, the "only possible use [of the tapes] would have been for the purpose of cumulatively indicating bias."[22] In the light of the overwhelming evidence offered by five other witnesses, further examination by the use of the information on the tapes would not have been of any material consequence and would not have added appreciably to the further impairment of her credibility. Moreover, even without Richardson's testimony the prosecution's case was

---

19. *Cf.* United States v. Borelli, 336 F.2d 376, 393 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

20. United States v. Keogh, 391 F.2d 138, 146–147 (2d Cir. 1968).

21. In an affidavit to the Appellate Division the Assistant District Attorney who prosecuted the case swore he was on vacation when the wiretapping occurred and that when he was told by a subordinate there was nothing of evidentiary value on the tapes he did not waste time listening to them. Brief for Respondent at 23–24, People v. Butler, 28 N.Y.2d 499, 318 N.Y.S.2d 943, 267 N.E.2d 587 (1971).

22. 33 A.D.2d at 676, 305 N.Y.S.2d at 369.

powerful. Thus, before the body of the murdered man was found, Butler had made a complete and detailed confession to Rachun, who saw powder burns on Butler's hands, and after the dismantling of the murder weapon, drove him to Newton Creek where Butler threw the fragmentized parts into the creek. A few days later Butler also confessed the killing to Kraft, stating the motive for assaulting the victim and the circumstances of the killing, and during the next few years made incriminating statements to Tron, Haake and Hillowitz.

As to the claim that the prosecutor in his summation unfairly referred to Richardson as a friend of petitioner and her testimony as an attempt to "protect" and "save" him and that this argument could not have been made had the tapes been available to the defendant, the charge is overstated. The prosecutor made no attempt, as petitioner claims, to vouch for Richardson as a reputable witness—quite the contrary, he frankly stated ". . . Lynn Richardson is what she is, and that's no apology for

[her]. I'm not going to start praising Lynn Richardson's mode of life. . . . She's been convicted of prostitution twice. You know what Lynn Richardson is." A reading of the defense summation shows that the prosecutor was justified in his references in reply;[23] moreover, Richardson's testimony does indicate that at times she tried to cover up Butler's role and to protect him by falsely claiming at one point that Butler told her he had been assaulted by the decedent.

■ Upon a word by word review and study of this record, and upon the totality of evidence, I am persuaded to a moral certainty that even if the defense had the use of the tape recordings for further cross-examination of Richardson, it would not have changed the mind of a single conscientious juror.[24] In sum, even assuming an error of constitutional proportions by the failure to turn over the tapes to petitioner, this court is satisfied beyond a reasonable doubt that at most it was harmless error.[25]

The petition for a writ of habeas corpus is dismissed.

---

23. "Now, the story seems to be here from the defense concerning Lynn Richardson that Miss Richardson is testifying to bury Butler because Butler had her arrested one time in March for prostitution. And yet in his own summation this morning, Mr. Leighton pointed out to you that Lynn Richardson was still living with Butler as late as June. So that doesn't jive, does it?

"Now, besides that. Lynn Richardson. Did you ever see a witness, did you ever see anybody—not necessarily a witness—did you ever see anybody—It was like pulling teeth to get a story from Lynn Richardson when she was on the witness stand. 'Keep your voice up.' 'Keep your voice up.' Did you ever see anybody more reluctant than she was to tell what Butler had told her? Her whole attitude on that witness stand was going to be and was that she would tell as little as possible about Butler. Wasn't that obvious as she sat there?

"And isn't her whole performance concerning this matter indicative of the fact that she's trying to protect Butler, not to frame him, but to protect him?" Record, vol. 2, at 944–45, People v. Butler, 33 A.D.2d 675, 305 N.Y.S.2d 367 (1969)

24. *See* United States v. Keogh, 289 F.Supp. 265 (S.D.N.Y.1968), aff'd, 417 F.2d 885 (2d Cir. 1969) ; cf. United States v. Keogh, 391 F.2d 138, 149 (2d Cir. 1968).

25. *Cf.* Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) ; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) ; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).