372 So.2d 143 (1979)
Patricia ANDREWS, Appellant,
v.
The STATE of Florida, Appellee.
No. 77-796.
District Court of Appeal of Florida, Third District.
June 12, 1979.
Rehearing Denied July 13, 1979.
*144 Bennett H. Brummer, Public Defender and Elliot H. Scherker, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Steven R. Jacob, Asst. Atty. Gen., for appellee.
Before HAVERFIELD, C.J., and PEARSON and HUBBART, JJ.
PER CURIAM.
The appellant and three co-defendants (Mark Sublette, Bruce Dunham and Michael Dias) were charged by indictment with murder in the first degree, robbery, burglary and grand larceny. The larceny count was amended to petty larceny prior to trial. The defendant was arraigned and stood moot; a plea of not guilty was entered by the court. A motion for severance was filed and denied by the court. The defendant was tried in a joint trial with co-defendant Sublette.[1] At the conclusion of the jury trial, the jury returned verdicts of guilty on all charges. The defendant was adjudicated guilty and a life sentence was imposed on the murder conviction with consecutive life sentences imposed on the robbery and burglary convictions.
On this appeal, four points are presented. The first urges error upon the denial of defendant's motion for severance. The second urges error upon the admission of statements of the defendant by which she confessed to participation in the crimes. The third seeks reversal upon a claimed comment on her right to remain silent when questioned by police officers. The fourth urges error upon the court's refusal to allow defense counsel to depose a co-defendant who, during the trial, agreed to testify for the State in return for immunity from his testimony and a reduction in the charges against him.
The only point requiring extensive discussion is the first point presented, which urges error in the denial of motion for severance. We hold that this point does not present error where the evidence of the co-defendant was cumulative of other evidence presented by the State and the proof of defendant's guilt, without the cumulative statement, was overwhelming.
The body of the victim, Louis Broeker,[2] was discovered by his nephew, Joseph Tripp, and his sister, Ella Tripp, at approximately 3:00 a.m. on October 5, 1976, in a bedroom of their residence at 450 Grand Canal Drive in Dade County.
*145 Upon his return home, Tripp observed that the kitchen light was on and also observed several purses belonging to his mother on the floor in a hallway; the purses were open. He conducted a brief search of the house, and then went to the bedroom in which his mother was sleeping. He told his mother that there had been a burglary, and the two of them went to the bedroom in which Broeker slept. Tripp observed that Broeker was not breathing and that his body was cool; he also observed that his ankles were tied. His mother observed a wallet which belonged to Broeker on the floor of the room; money had been removed from the wallet and from her purses. Then when Tripp entered the kitchen of the home, he observed that the cord had been removed from the telephone in the kitchen.
In conducting an autopsy on the body, the examining physician observed bruises to the head, torso and buttocks of the victim. These injuries were stated to be consistent with blunt traumas. Internally, the physician observed several fractured ribs and attendant hemorrhaging, and a bruise to the left lung. He testified that these injuries would have interfered with the ability of the victim to breathe. He also observed ligature markings on the ankles; he stated that the ligatures and the posture of the victim on the bed would have interfered with respiration.
The autopsy also revealed a significant loss of blood. The initial conclusion was that death was caused by the various blunt traumas. However he also stated that there was a possibility of asphyxiation caused by smothering. He further testified that the blunt injuries would have been sufficient to cause death.
The defendant was observed in the vicinity of the Tripp residence at approximately 3:00 a.m. on October 5, 1976, by William A. Tracy, a neighbor. Tracy testified that he observed a gold Chevrolet parked outside of his home at approximately that time, and that he drove his own automobile alongside the Chevrolet to investigate. The defendant subsequently approached, and informed him that the Chevrolet was her automobile. She thereupon agreed to move the vehicle; Tracy drove away, and observed the Chevrolet drive away from his home. After purchasing a newspaper, Tracy returned to his home and observed that the Chevrolet was gone.
Tracy testified that the defendant appeared to be extremely tired. He inquired whether she "had a problem" and the defendant responded that she was looking for her sister.
Police investigators discovered a hammer and a letter opener outside the house and two knives inside the house, one found on a sofa and another found in the kitchen. A total of one hundred and eleven latent fingerprints were lifted from various surfaces and objects in the house. Latent fingerprints were also lifted from the Chevrolet automobile belonging to the defendant. Latent fingerprints which were lifted from the front door of the residence and from the letter opener recovered by investigators were identified as belonging to the defendant. A latent fingerprint removed from the rear view mirror of the automobile was also identified as belonging to the defendant.
The prosecution introduced several oral statements and a written statement made by the defendant. Prior to trial, the defense filed a motion to suppress these statements on the grounds that the statements were made involuntarily. The motion was heard prior to trial. The defendant testified that on the day of her arrest, she had not slept in forty-eight hours and that during this period of time, she had continually consumed alcoholic beverages. She testified that she had been drinking every night for a period of eighteen months and that she was heavily intoxicated at the time of her arrest.
She was initially interrogated by Detective Steven Jackson. A second interrogation was conducted by Detective Thomas Gergen. The defendant testified that she did not remember being read her rights by Jackson, and that she was "not really aware" of her rights at the time of her arrest.
*146 Approximately six hours after her arrest, Detective Gergen interrogated her. The defendant testified that she requested the presence of an attorney, but that she was not given an opportunity to contact a lawyer. She stated that the actions of the officers "influenced me to make a statement I would not have made."
After Detective Gergen took a statement from her, the defendant was given an opportunity to review her statement. She was requested to initial the pages of the statement; after a period of time, she stopped doing so and requested the presence of an attorney.
She testified at trial that the statement was not entirely true, and that her admission that she had struck the victim was not true. She testified that she had been told of the statements given by codefendants, and that she was questioned repeatedly until she made a similar statement. She stated that she gave the statement because she had been abused, and feared further abuse if she did not make an inculpatory statement.
At trial, Detective Jackson testified that he obtained a statement from the defendant by 3:30 a.m. on the day of her arrest; he first spoke with her at approximately 2:30 a.m. Detective Gergen, who did not testify at the hearing on the motion to suppress, testified that he subsequently took a statement from the defendant during the early morning hours of October 6th, and that he made no promises or threats to the defendant. The defendant made no complaints about the manner in which she had been treated. He did not detect an odor of alcohol about the defendant, and testified that there was nothing unusual about her gait. The motion to suppress was denied; it was renewed at trial and was denied.

Defendant's Oral and Written Statements
The oral confession given by the defendant was related by Detective Jackson at trial. He stated that he first interviewed the defendant at approximately 2:30 a.m. on October 6th, at which time he advised her of her constitutional rights. The defendant told Detective Jackson that she had gone to the Tripp residence to seek assistance in the company of three other individuals. She knocked on the door, and when no one answered, the other individuals went to the rear of the house, entered through a window, and let her in through the front door. The defendant stated that she obtained food from the kitchen, but "[a]t no time" entered the bedroom.
When the State sought to introduce the written statement of the defendant at trial, defense counsel objected on the grounds that the statement was unsigned and had not been acknowledged by the defendant. The court ruled that the pages which the defendant had initialed would be admitted. The court further ruled that the stenographer who recorded the statement could read her notes of the remaining pages.
The statement reflects admissions by the defendant that she met an individual identified only as "Joe" at a lounge in Sweetwater in 1975. At the time that she met this individual, the defendant was with Bruce Dunham, one of the co-defendants. Joe allowed the defendant and Dunham to stay at his residence for several days.
The defendant stated that on October 4, 1976, she was at an establishment known as the Pine Tree Bar with Dunham when they encountered an individual identified only as "Richard." With Richard were the other co-defendants, Michael Dias and Mark Sublette. The five of them subsequently went to the motel where Richard, Dias, and Sublette were living; Richard left, and the four of them then went to the Jamaica Motel where the defendant and Dunham were residing. The defendant stated that the four of them left the motel and went to the Tripp residence in her automobile, arriving at approximately 10:30 p.m.; the defendant intended to inquire of Tripp if she could stay at the house. After she knocked at the door and received no answer, Sublette went to the rear of the house and opened the front door.
*147 The defendant, Dias, and Dunham then entered the house. The defendant stated that she remained in the living room, smoking a cigarette and drinking wine, while Dias went upstairs and Sublette went into the bedroom. The defendant then went into the kitchen and removed a container of cottage cheese from the refrigerator. As she did so, Sublette entered the kitchen and cut the cord from the telephone. Sublette then returned to the bedroom, and the defendant followed. She observed Dias, Dunham, and Sublette in the bedroom; Dunham was holding the victim on the bed, and Sublette and Dias were binding his feet with the telephone cord and several belts.
The defendant stated that Sublette had obtained a hammer outside of the house, and that she (the defendant) struck the victim with the hammer. Specifically, the defendant stated that she struck the victim three times on the hip. At this point, a pillow which had been on the face of the victim was lifted, and the defendant stated, "My God, this is an old man. Let's quit it. Let's get out." At this point in the statement, the defendant ceased initialling the pages.
In the remaining portion, the defendant stated that the pillow had been on the face of the victim, and that she had thought that this person was "Joe," the individual who she believed resided at the house. At this point, the four of them left the house. The defendant, who was holding two knives given to her by Sublette, dropped the knives on the ground outside the house. She stated that she vaguely recalled speaking to a man when she went to her automobile, and that she moved the vehicle and the other three individuals then entered the automobile. She stated that "[t]hey took the car and they left me." Dias was then let out of the automobile, whereupon the others returned to the defendant and all of them drove back to the motel.
The defendant stated that Sublette removed monies from a wallet in the bedroom and from a purse found in the residence. The monies were divided among the four of them.
On cross-examination, the defendant was asked whether the stenographer had accurately transcribed the statements on those four pages, and the prosecutor thereupon moved the pages into evidence.

Defendant's Trial Testimony
At trial, the defendant testified that she was not aware that Broeker was in the house when she and the co-defendants entered. She denied having ever struck Broeker. She stated that when she approached the bedroom and saw Broeker being tied, she said, "I don't want any part of this" and she subsequently fled the residence.
The defendant testified that after she and Dunham met Sublette and Dias at the bar, and subsequently returned to her motel, Dias and Sublette mentioned the possibility of committing a burglary to Dunham. She did not encourage them to do so, and remained silent. Dunham suggested the possibility of burglarizing the Tripp residence.
The others then requested permission to use her automobile, and she refused, finally agreeing on the condition that she accompany them. After Sublette let them in through the front door, she entered, but testified that she had no intention of taking anything. She remained in the living room for a brief period of time, while Dias went upstairs and Dunham and Sublette went into the bedroom. She then went into the bedroom and observed the victim bound. The defendant denied having struck the victim. The defendant admitted having received a portion of the proceeds from the burglary.

Co-Defendant Sublette's Oral and Written Statements
Oral and written statements of the co-defendant Sublette were also introduced into evidence at their joint trial. These statements further inculpated the defendant.
In his initial oral statement, Sublette stated that the defendant entered the bedroom as Dias was striking Broeker with the *148 hammer. She instructed Dias to strike Broeker harder, and then took the hammer from Dias and struck Broeker three times on the hip. He also stated that it was the defendant who had suggested burglarizing the Tripp residence.
Sublette also told police officers that after they left the residence, the defendant directed them to return, saying that she wanted to remove her fingerprints from the refrigerator. They drove back to the house and the defendant entered alone. The others then drove away, returned, and the defendant then left with them.
Counsel also renewed the motion for severance during the trial on the grounds that counsel for Sublette was relying upon the defense that the defendant had returned to the scene after the initial burglary and murdered Broeker. The motions were denied. Counsel for Sublette argued this theory to the jury in opening statement and in his closing argument to the jury.

Co-Defendant Dias's Trial Testimony
Trial initially commenced on February 14, 1977. The taking of testimony in the trial-in-chief commenced on February 15, 1977. On Friday, February 18th, the fifth day of trial, the prosecutor announced that the co-defendant Dias might be a prosecution witness:
"I anticipate the possibility that Michael Dias might be called to testify for the State. He will be testifying against Patricia Andrews, if he does testify."
At the close of proceedings on that day, the prosecutor announced that "Mr. Dias has indicated his willingness to testify."
When proceedings commenced on Saturday, February 19th, counsel for Dias announced that in exchange for an agreement by the prosecution to reduce the first degree murder charge against Dias to a charge of murder in the second degree, Dias would testify for the prosecution. At that point, counsel for the defendant moved for leave to depose Dias. The court refused to allow counsel to take a deposition of Dias. During his testimony, Dias stated that he was told for the first time on the previous day that his attorney and the prosecutor had been negotiating, and that he had not discussed testifying for the prosecution until that day.
Dias testified that he had met Sublette in Georgia and that they had hitchhiked to Florida. In Daytona Beach, they met an individual identified as "Richard" and drove to Miami with him. Once having arrived in Miami, they went to an establishment know as the Pine Tree Bar where Richard introduced them to the defendant and Dunham.
Dias stated that he, Dunham, Sublette and the defendant went to the Jamaica Motel from the bar. At the motel, Sublette suggested committing a burglary and the defendant suggested a particular house. The four of them discussed the manner in which they would enter the house, and then left the motel, taking knives with them. Dias stated that the defendant said that "she had lived in the house for a time and she indicated there was money inside."
They drove to the house, which the defendant identified. The defendant approached the front door and rang the bell; after no one answered the door, the four of them discussed attempting to open the door and Sublette attempted to do so. He was unsuccessful. The defendant then suggested that they "go around to the back of the house." He, Dunham, and Sublette did so, and Sublette and Dunham entered the house through a window.
Dias stated that he remained in the living room while Dunham went upstairs and Sublette looked through the bedrooms. He testified that the defendant told Dunham to "look upstairs." Dunham returned and informed the others that no one was upstairs, and Sublette informed them that there was an individual in the bedroom. At that point, the defendant "said she wanted the man incarcerated." She then told Sublette to disconnect the phone; he complied by removing the cord from the telephone.
Dias, Dunham and Sublette then entered the bedroom while the defendant remained in the living room. As they went into the bedroom, the defendant again instructed *149 them to "incarcerate the man." Upon entering the bedroom, Dias handed a pillow to Sublette; Dunham and Sublette held it over the head of the victim. Broeker awoke, and was threatened, whereupon Sublette and Dunham bound him while Dias held the pillow.
The defendant then entered the room and suggested to Dias that he "hit the man with the hammer." Dias had obtained the hammer outside of the house. Dias struck Broeker once on the head with the hammer; the defendant then took the hammer and struck Broeker "[t]en or more times" on the hips, legs, and lower chest. The pillow was still on the face of the victim at this time.
Subsequently, the pillow was removed from the face and the defendant stated that "that was the wrong man." They decided to leave and Sublette at that time removed money from a wallet in the room and from a purse which he removed from another bedroom. The defendant took an apron and "started to brush off prints from the refrigerator;" she then stated, "It's time to leave."

I.
Defendant asserts that this case is governed by Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which held that admission into evidence at a joint trial of inculpatory statements of a co-defendant who did not testify denied an accused of the right to confront and cross-examine as guarantied by the Sixth Amendment. In order to effectuate the rights upheld in Bruton, the Florida Supreme Court promulgated Florida Rule of Criminal Procedure 3.152(b)(2). This rule provides:
"(2) If a defendant moves for a severance of defendants on the ground that an oral or written statement of a co-defendant makes reference to him but is not admissible against him, the court shall determine whether the State will offer evidence of the statement at the trial. If the State intends to offer the statement in evidence, the court shall order the State to submit its evidence of such statement for consideration by the court and counsel for defendants and if the court determines that such statement is not admissible against the moving defendant, it shall require the State to elect one of the following courses:
"(i) a joint trial at which evidence of the statement will not be admitted;
"(ii) a joint trial at which evidence of the statement will be admitted after all references to the moving defendant have been deleted, provided the court determines that admission of such evidence with deletions will not prejudice the moving defendant; or
"(iii) severance of the moving defendant."
The right to severance in Florida is not a new one. In Suarez v. State, 95 Fla. 42, 115 So. 519 (1928), the Supreme Court held that the granting or denial of a motion for severance is largely discretionary and the ruling of the trial court thereon will not, in general, be disturbed where no abuse of discretion is shown. In that case, the court found an abuse of discretion, and held:
"While the question is not free from difficulty, we are inclined to the opinion that the court below committed reversible error in denying the motion of the defendants Suarez for a severance in this case. The subsequent developments, in the taking of the testimony, showed that this ruling was not a harmless error."
* * * * * *
In the more recent case of Thomas v. State, 297 So.2d 850 (Fla. 4th DCA 1974), the court held that a "pretrial motion to sever should have been granted. Because the cocaine was found on the floor between the co-defendant's legs, a conflict between the defendants' defense was inherent in the case." In the instant case, Sublette did not testify but both an oral and written statement were introduced into evidence. We are convinced that error does not appear under the Bruton rule as applied by the courts of this state. It appears from the record that if the trial of co-defendant Sublette had been severed from the trial of *150 defendant Andrews (the present appellant) and the co-defendant's statements had not been admitted in the defendant's trial, there would still have been overwhelming evidence of the defendant's guilt. The co-defendant's statements were cumulative to the evidence which was properly admitted. It appears from the defendant's confession and testimony that there was overwhelming evidence of her participation in the crime. The co-defendant's statements were insignificant in comparison with, and were cumulative to, the defendant's confession and her statements on the stand. The case of Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), holds a Bruton violation harmless where properly-admitted evidence of the defendant's guilt is so overwhelming that without the co-defendant's statements, the State's case would not be much less persuasive. We hold that the Schneble case is governing here.
The defendant's confession is full and complete in itself. The defendant admits she entered the victim's home without permission, was aware that the victim had been struck in the bedroom, did not call the police, remembers being seen by a neighbor and admits to taking her share of the proceeds of the crime. She admits having committed the burglary, having committed the robbery, and having hit the victim. She testified that the victim had been tied up. She aided and abetted the participants. Even if the others with her were the ones who physically killed the victim, she is equally guilty as a matter of law. See Section 777.011, Florida Statutes (1975). In addition, the liability for first degree murder extends to all co-felons who are present during the perpetration of a robbery or burglary. See Section 782.04(1)(a), Florida Statutes (1975); State v. Jefferson, 347 So.2d 427 (Fla. 1977); Adams v. State, 341 So.2d 765 (Fla. 1976); and State v. Dixon, 283 So.2d 1 (Fla. 1973). Therefore, given the defendant's version of running out of the house when she saw the victim tied up and not returning, but participating in the criminal activities before and after, she does not have a defense.
We are reinforced in this respect by the decision in Simpson v. Wainwright, 439 F.2d 948 (5th Cir.1971), where a habeas corpus petitioner alleged a Bruton violation because a co-defendant's confession was admitted at trial. The court affirmed the lower court's denial of the habeas corpus relief because the case against Simpson was so overwhelming as to invoke the harmless error rule. We, therefore, hold that no error has been demonstrated under this point.

II.
We also find the defendant's remaining points unsubstantial. The second point is directed to the admission into evidence of the defendant's statements confessing to participation in the crimes. It is argued that the trial judge (1) failed to find that the statements were voluntary and (2) should not have allowed into evidence a portion of a statement which had neither been signed nor been acknowledged in court. There was no issue of voluntariness in the trial court. The defendant did contend that she was intoxicated at the time she waived her Miranda rights. The trial judge made a finding of voluntariness which included the statement of the defendant given immediately after she waived her rights. Also, there was no suggestion of coercion or influence on the defendant after the waiver of her rights. We hold that the requirements of McDole v. State, 283 So.2d 553 (Fla. 1973), were fully complied with. Cf. the statements of law in Greene v. State, 351 So.2d 1031 (Fla. 4th DCA 1976); and Collins v. Wainwright, 311 So.2d 787 (Fla. 4th DCA 1975).
The defendant initialed the first ten pages of her transcribed statement. These pages were, of course, properly admitted. The remaining four pages were admitted only after the stenographer who had taken the statement read her notes into the record. This admission of the four pages as an oral confession was proper. See Morris v. State, 100 Fla. 850, 130 So. 582, 586 (1930); and Williams v. State, 185 So.2d 718 (Fla. 3d DCA 1966).
*151 The force of the defendant's argument is greatly reduced by the fact that she testified to the same facts which were included in her confession.
The defendant's third point concerning the admission of testimony of the exercise of her right to remain silent does not arise from the record. There was no objection on this ground in the trial court to the question and answer now objected to. Furthermore, the defendant did not remain silent and the jury was not misled to believe that she did. Cf. Williams v. State, 353 So.2d 588 (Fla. 3d DCA 1977).
The last point claims error in the denial of a continuance to take the deposition of a tendered state witness. The motion for continuance was based upon surprise because the witness, Diaz (a codefendant who was to be tried separately), became available as a State's witness. No concealment or failure to discover appears from these facts. The trial judge's decision that a continuance was not necessary in order to afford the defendant a fair trial is supported by the record. The testimony of the witness was cumulative. The decision of the trial judge not to grant a continuance will be reversed only when a clear abuse of discretion is made to appear. See Graham v. State, 143 So.2d 567 (Fla. 3d DCA 1962). No abuse of discretion appears in the ruling of the trial judge. Cf. Miranda v. State, 237 So.2d 228 (Fla. 3d DCA 1970).
Having considered the points presented and finding no prejudicial error, the judgment and sentence are affirmed.
Affirmed.
NOTES
[1] This court's opinion upon the appeal of Mark Sublette, filed December 12, 1978, is reported at 365 So.2d 775 (Fla. 3d DCA 1978).
[2] This statement of facts is excised from the statement of facts furnished by the defendant in order to give the statement the full benefit of a most favorable presentation.