UNITED STATES

v.

**Robert M. GARRETT, 577 94 8743, Private First Class (E–2), U.S. Marine Corps.**

NMCM 82 2670.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 30 Nov. 1981.

Decided 5 Aug. 1983.

LCDR David S. Durbin, JAGC, USNR, Appellate Defense Counsel.

LT William V. Cerbone, Jr., JAGC, USNR, Appellate Government Counsel.

Before BOHLEN, Senior Judge, and EOFF and KERCHEVAL, JJ.

BOHLEN,* Senior Judge:

Appellant was tried by a general court-martial constituted of officer members. Contrary to his pleas, appellant was convicted of attempted robbery, conspiracy to commit robbery, unpremeditated murder and felony murder, in violation of, respectively, Articles 80, 81 and 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 881, 918. He was sentenced to confinement at hard labor for life, forfeiture of all pay and allowances, reduction to the lowest enlisted pay grade and a dishonorable discharge. The convening authority approved the findings and sentence without modification.

Appellant has assigned nine separate errors, one of which is meritorious to the extent that a rehearing is required. Accordingly, our recitation of facts and accompanying discussion will be limited to that single assignment, namely:

> THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS ALL OF (PRIVATE) WEAVER'S TESTIMONY.

Appellant was one of three co-accuseds who were implicated for the murder of a fellow Marine, Corporal Murphy, in Henoko Ville, located outside Camp Schwab, Okinawa, Japan. On the night of the murder, Corporal Murphy, the appellant and the other two co-defendants, Lance Corporal (LCPL) Chupp and Private First Class (PFC) Dodson, were on liberty in Henoko. The attempted robbery charge arose from a brief confrontation between the three co-accuseds and Corporal Murphy outside the "Shack" Shige, a bar in Henoko. After the encounter, the three co-accuseds walked away from the scene together and Corporal Murphy returned to the bar. At about 0300 that same evening Corporal Murphy, who was by then quite intoxicated, left the Shack Shige and was apparently looking for his three prior assailants. Approximately two hours later, Corporal Murphy was found dead. He had abrasions around his right eye, nose and temple, and nonfatal stab wounds to his chest and below his left ear. According to the autopsy, Corporal Murphy bled to death as the result of a fatal stab wound in the back which punctured his left lung and aorta. Corporal Murphy's empty wallet was found alongside his body. Prior to the murder, he had a substantial amount of cash in his wallet because he had recently been paid. Although there were witnesses to the confrontation outside the Shack Shige, there were no witnesses to the actual murder, nor was the murder weapon found.

---

* Senior Judge Bohlen took final action in this case prior to his retirement from the Court on

June 30, 1983.

At trial, a fellow inmate, Private Weaver, testified over defense objection that he had overheard an incriminating conversation among the co-accuseds between 0230 and 0300 on June 22nd 1981 in the administrative segregation portion of the Camp McTureous brig. Private Weaver was in cell number one in a row of nine, individual cells. PFC Dodson was in cell number three, appellant in cell number five and LCPL Chupp in cell number seven. Private Weaver testified to overhearing a conversation in which LCPL Chupp told PFC Dodson, "Hey you better keep quiet about that or we're going to get in trouble." PFC Dodson then replied "F_____ that swine, I'm glad we did it. He shouldn't have been f_____g around with Garrett." Private Weaver then stated he heard appellant say "Cool it." Private Weaver further stated that he believed the statement to refer to Corporal Murphy. He could not recall any of the conversation before or after the portion he related to the members.

During the military judge's instructions to the members before deliberation upon findings, he commented upon Private Weaver's testimony concerning "statements possibly attributed to PFC Dodson or the defendant:"

... [Y]ou will recall that Private Weaver testified that he heard PFC Dodson say during a conversation in the brig with Lance Corporal Chupp and the defendant, "F_____ that swine, I'm glad we did it, he should not have been f_____g around with Garrett anyway." With regard to (this) bit of evidence, you may ask, is "this some sort of hearsay that I can either not consider or which I can consider for only a limited purpose?" My answer to this question is, "No," this is admissible evidence and you may consider it as you may consider other evidence in this case. You may attach such weight as you believe it deserves under all the circumstances.

■ There is no doubt that PFC Dodson's statement was an admission against his interest. It was offered as such at his trial and received into evidence for the truth of

the matters contained therein. The general rule with regards to the separate trials of PFC Dodson's co-defendants, however, is that his extrajudicial declaration is admissible only against himself as an admission, and not against any co-actors, absent an express, implied or vicarious adoption. *See* McCormick, *Evidence* sec. 239 (1954); 4 J. Wigmore, *Evidence* sec. 1076 (Chadbourn Rev. 1972); Mil.R.Evid. 801(d)(2)(B–D). Most of the litigation over this rule has centered around an exception for extrajudicial, inculpatory admissions of one co-conspirator offered to prove the guilt of another co-conspirator. The general rule arising from these cases is that such statements are not admissible on the theory that they were made in furtherance of a criminal conspiracy where the subject matter of the conspiracy has ended in final success or failure. *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1948); *Fiswick v. United States,* 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946). Although the states have been allowed to rely upon an implied continuing conspiracy to conceal guilt, the federal courts have not been granted such latitude and are held to the general rule. *See Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213, 222 (1970). Military courts are similarly limited by Mil.R. Evid. 801(d)(2)(E) to the "statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

■ The conspiracy to rob Corporal Murphy ended upon apprehension of appellant and his co-defendants. We are unpersuaded by appellate government counsel that the conspiratorial motive extended to the brig conversations, especially in light of (1) a failure to allege and prove a separate conspiracy to obstruct justice, and (2) a failure to cite any precedent in support of his motion.

■ Neither are we persuaded by the alternate method advanced by government counsel at trial that appellant adopted the statement, either expressly or impliedly. Evidence of a post-conspiratorial statement may be admitted as an adoptive admission under Mil.R.Evid. 801(d)(2)(B), only if: (1)

the party against whom it is offered was present during the making of the statement; (2) he understood its content; and (3) his actions or words or both unequivocally acknowledged the statement in adopting it as his own. *See generally* Annot., 4 A.L.R.3d 678 (1965). The statement was part of a conversation between two inmates in a row of nine individual cells, each separated by a cinder block wall. Obviously, this was not a casual "camp stool" conversation in which all participants could personally view each other's reactions to the subject matter of the conversation. Appellant's response of "cool it" neither suggests active participation in the conversation, understanding of its content, nor manifests an unequivocal acceptance of it. Rather, appellant's response to a conversation at 0230–0300 in the morning of "cool it" is better understood to be a demand to "keep quiet."

We have also considered other non-hearsay methods of admitting PFC Dodson's statement such as *res gestae* and admission by silence. Additionally, we considered the hearsay exception of excited utterance as advanced by government counsel at trial. None of these methods has merit. This leads us to an examination of the method of admission that prevailed at trial—a statement against PFC Dodson's penal interest pursuant to Mil.R.Evid. 804(b)(3).

### Mil.R.Evid. 804(b)(3)

■ Extrajudicial statements against a declarant's penal interest are admissible under Mil.R.Evid. 804(b)(3) if: (1) the declarant is unavailable; and (2) the statement at the time of its making so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true. A third requirement limits the offer by the accused of *exculpatory* extrajudicial statements to situations in which "corroborating circumstances clearly indicate the trustworthiness of the statement." Mil.R.Evid. 804(b)(3). An area left unanswered by the

drafters of the underlying, identical Fed.R. Evid. 804(b)(3) was the "troublesome type of declaration against penal interest: the inculpatory statement against the penal interest of the declarant which also implicates and is sought to be admitted against the defendant." Comment, *Federal Rule of Evidence 804(b)(3) & Inculpatory Statements Against Penal Interest,* 66 Calif.L.Rev. 1189, 1190 (1980). PFC Dodson's extrajudicial declaration falls within this area.

The reasoning behind the omission of a provision regarding extrajudicial, inculpatory statements in Fed.R.Evid. 804(b)(3) is reflected in its legislative history:

> The House amended this exception to add a sentence making inadmissible a statement or confession offered against the accused in a criminal case, made by a co-defendant or other person implicating both himself and the accused. The sentence was added to codify the constitutional principle announced in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Bruton held that the admission of the extrajudicial hearsay statement of one co-defendant inculpating a second co-defendant violated the confrontation clause of the sixth amendment.
>
> The committee decided to delete this provision because the basic approach of the rules is to avoid codifying, or attempting to codify, constitutional evidentiary principles, such as the fifth amendment's right against self-incrimination and, here, the sixth amendment's right of confrontation. Codification of a constitutional principle is unnecessary and, where the principle is under development, often unwise. S.Rep. No. 93–1277, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. and Admin.News pp. 7051, 7068.

Although the federal rules committee read Bruton in a general manner as applying to all criminal trials, Mil.R.Evid. 306 codified a narrow reading of Bruton to apply only to joint trials.[1]

---

1. This limited reading appears to conform to language in *Parker v. Randolph,* 442 U.S. 62, 75, 99 S.Ct. 2132, 2140, at n. 7, 60 L.Ed.2d 713, 725 (1979): "Clearly Bruton was tied to the

Anytime that a new hearsay exception is created, a situation arises in which evidence is considered under circumstances in which an accused has no opportunity to test its validity by confronting and cross-examining its declarant. It is the Mil.R.Evid. 804 "unavailability" of the declarant requirement upon which the sixth amendment confrontation clause considerations are hinged. Under certain circumstances, considerations of public policy and necessity require the recognition of hearsay exceptions. Within the context of Mil.R.Evid. 804(b)(3), as long as the evidence has specified qualities, ensuring its reliability, its use is preferred over its complete loss. The legislature's ability to carve out new exceptions to the hearsay rule, however, is limited by a separate body of constitutional cases interpreting the hearsay rules in relation to the confrontation clause. *See* Federal Rules of Evidence, *Advisory Committee's Note, reprinted in* Salzburg & Redden, *Federal Rules of Evidence Manual, 3d Ed.* 550 (1982). Although evidence may be admissible in conformity with an evidentiary rule, it may nonetheless be precluded by sixth amendment considerations. *California v. Green,* 399 U.S. 149, 155–156, 90 S.Ct. 1930, 1933–1934, 26 L.Ed.2d 489, 495 (1970).

Mil.R.Evid. 804(b)(3) appears to create a category of admissible evidence that would be otherwise inadmissible under Mil.R.Evid. 801(d)(2)(B–E) because of sixth amendment considerations. Rather than address the paradox it created, the drafters of the federal rule foisted the problem upon the courts by stating, "The rule does not purport to deal with the questions of the right of confrontation." 56 F.R.D. 183, 186 (1972). Indeed, we must now deal with it. Accordingly, our analysis of the admissibility of Private Weaver's testimony, under Mil.R.Evid. 804(b)(3), must address two sub-issues:

WAS PRIVATE WEAVER'S TESTIMONY AS TO THE EXTRAJUDICIAL, INCULPATORY STATEMENT OF PFC DODSON PROPERLY ADMITTED AGAINST APPELLANT UNDER Mil.R. Evid. 804(b)(3)?

and

DID THE ADMISSION OF PRIVATE WEAVER'S TESTIMONY VIOLATE APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES AGAINST HIM?

*Admission Under the Rule*

■ The military judge's ruling admitting the hearsay statement of PFC Dodson against appellant considered the following factors:

... circumstances *corroborating* the statement and *clearly indicating* its truthfulness ... not a situation where custodial statement is given under such circumstances that it could be made to curry favor with the police who are investigating the co-conspirator ... can be regarded as a spontaneous declaration made to friends and confederates, as opposed to a custodial confession ... appears to be a statement made between suspects in a murder case, overheard by another prisoner... (Emphasis added.)

The initial military court consideration of the admissibility of statements against penal interest was directed at *exculpatory* statements and held that the test for admission was "*(t)rustworthiness* of such a declaration, ..., rather than a flat evidentiary rule." *United States v. Johnson,* 3 M.J. 143, 147 (C.M.A.1977). This Court, in *United States v. Dillon,* No. 80–2842 (N.M.C.M.R. 29 June 1982), *appeal docketed,* No. 44,664 (CMA 19 October 1982), held inadmissible a statement against penal interest offered to exculpate an accused because of a lack of sufficient corroborating circumstances.

We cannot see how a separate test, or no test, should similarly exist for *inculpatory*

situation in which it arose 'where the powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial' *Id.,* at 135–136, 88 S.Ct. 1620 [1627–1628], 20 L.Ed.2d 476." *See contra Hendrix v. Smith,* 639 F.2d 113 (2d Cir. 1981); and *Goodwin v. Page,* 418 F.2d 867 (10th Cir.1969) (*Bruton* rule applied in separate trials of co-defendants).

statements. The fact of legislative omission of a parallel test must be filled by this court to equate with the holdings of the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Dutton, supra,* that the statement must possess "indicia of reliability" prior to admission. *Ohio v. Roberts, supra,* 448 U.S. 56 at 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597; *Mancusi v. Stubb,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301 (1972). We therefore hold that the admissibility of *inculpatory* statements against penal interest under Mil.R.Evid. 804(b)(3) requires corroborating circumstances that clearly indicate the trustworthiness of the statement. *See United States v. Riley,* 657 F.2d 1377, 1383 (8th Cir.1981); *United States v. Palumbo,* 639 F.2d 123, 131 (Adams J., concurring) (3d Cir.1981); *United States v. Sarmiento-Perez,* 633 F.2d 1092 (5th Cir.1980); *United States v. Goins,* 593 F.2d 88, 92 (8th Cir. 1979); *United States v. Alvarez,* 584 F.2d 694, 701 (5th Cir.1978); *Lowery v. Maryland,* 401 F.Supp. 604 (D.C., Md.1975), aff'd mem, 532 F.2d 750 (4th Cir.1976), cert. denied, 429 U.S. 919, 97 S.Ct. 312, 50 L.Ed.2d 285 (1977).[2]

*The Rule as Applied to the Witness to the Statement*

■ The military judge instructed the members that the impeachment of Private Weaver as to his motive to falsify and his reputation for truth and veracity were matters of credibility that the members could utilize in determining what weight, if any, to attach to his testimony. Within the context of determining whether corroborating circumstances clearly indicate the trustworthiness of PFC Dodson's statement, it is also relevant to consider the impeachment of Private Weaver as a matter affecting the basic *admissibility* of the evidence—whether he fabricated it to assist the government.

By analogy to the corroboration requirement for exculpatory statements, we find the words of the Advisory Committee on the Proposed Rules persuasive: "The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." *Advisory Committee's Note, reprinted in* Salzburg, *supra,* at 667. We have no concern over the degree of trustworthiness to be assumed from the fact of who uttered the statement, or to whom it was directed, whether that be LCPL Chupp or appellant. Instead, our concern focuses upon the person who is testifying as to its contents. The rule refers to the trustworthiness of the *statement,* not its declarant. The trustworthiness of an overheard statement is directly affected by the believability of the one relating it to the court. *See United States v. Alvarez,* 584 F.2d 694, 701 (5th Cir.1978); *United States v. Bagley,* 537 F.2d 162, 167 (5th Cir.1976); McCormick, *supra,* sec. 278 n. 2 (informant's interest in securing a conviction); *caveat, United States v. Satterfield,* 572 F.2d 687, 692 (9th Cir.1978) (Exclusion of *exculpatory* statements because of unreliability of a witness may conflict with *Chambers, supra*).

The military judge's findings as to the corroboration requirement for an inculpatory statement against penal interest were not so far removed from our holding as to require review for abuse of discretion. Since, however, he made no findings as to the trustworthiness of the witness, Private Weaver, we must determine by independent review whether the evidence would have supported his ruling.

This is not a case in which PFC Dodson uttered his statement in the presence of several disinterested bystanders as in *U.S. v. McConnico, supra,* 7 M.J. 302, at 310. *See also United States v. Thomas,* 571 F.2d 285 (5th Cir.1978). Private Weaver was apparently the only witness to the conversation who was not legally "unavailable." He was

---

**2.** Both the military judge and the appellate government counsel adopted the holdings of *Sarmiento-Perez, supra,* and *Alvarez, supra,* in their assertion that the standard for admission of inculpatory statements under Mil.R.Evid.

804(b)(3) should be the "indicia of reliability." We believe that our holding as to the legal standard to be applied is consistent with their wishes by avoiding an absolute prohibition against the use of such evidence.

extensively impeached. In addition to the testimony of Private Weaver's First Sergeant that he believed Private Weaver to be untruthful, there was evidence of both internal and external motives to falsify his testimony.

Relevant to Private Weaver's internal motivation to fabricate was the testimony of a fellow inmate, Private Harris, who testified that in late June or early July Private Weaver told him that he wanted to "get" the people who murdered his "friend" (Murphy) and that "I'm going to say I heard something when I went back in (administrative segregation in the brig)." Private Harris then asked Private Weaver if he knew whether appellant, PFC Dodson and LCPL Chupp killed Corporal Murphy. Private Weaver replied, "No, but they have to have something on them if they have them in the brig, because they wouldn't put just anyone in the brig for murder." Later, after the Article 32 investigation, Private Harris asked Private Weaver, "why did he lie?" Private Harris said that Private Weaver put his head down and said nothing.

There were also external factors which may have influenced Private Weaver to testify in a manner favorable to the government. Three days prior to the joint Article 32 investigation, NIS interrogated all inmates who resided in either administrative segregation or disciplinary segregation during the time that the defendants resided in administrative segregation. NIS took two statements from Private Weaver, one on July 15th which contained the overheard conversation in issue, and one on July 20th. On July 18th, Private Weaver was removed from the Camp McTureous brig to a separate location. He testified at the joint Article 32 hearing on July 21st.

Prior to the NIS interviews, on July 3rd, Private Weaver's commanding officer spoke with a group of inmates, including Private Weaver. He told Private Weaver that he would consider granting him clemency from his special court-martial sentence. Later, on July 9th, the commanding officer received a request for clemency from Private Weaver's defense counsel and decided to grant the request. That decision was not communicated to Private Weaver prior to the NIS interviews. Private Weaver's words in his July 15th statement were, "I am due to be released in October '81 unless I receive clemency." Private Harris also testified to a conversation that occurred before the NIS interviews: "... he (Private Weaver) told me he didn't like the brig and wanted to get out anyways (sic) and when I was in seg(sic) and we talked to NIS, NIS told us they could help us if we got anything on Garrett, Chupp or Dodson." On July 31st, Private Weaver's sentence to six-months confinement at hard labor was formally cut in half by his commanding officer.

When determining whether to admit an in-court witness' testimony concerning a statement against penal interest, if the military judge concludes from the evidence before him that there is a high likelihood that the statement was not actually made, he must determine whether such evidence affects the reliability of the truth of the matter asserted. Having considered such factors, his admission or exclusion of the statement should be affirmed, unless an abuse of discretion can be shown. If properly admitted *after* such a consideration, then evidence bearing upon the credibility of the in-court witness is relevant for the finder-of-fact to determine what weight, if any, to attach to the testimony.

We find that Private Weaver's motive and opportunity to fabricate, coupled with his poor character for truth and veracity, sufficiently called into question his trustworthiness. This tainted the reliability of PFC Dodson's extra-judicial statement to the point that it should have been excluded from consideration by the members as proof of the ultimate fact. Uncertain as to the prospect of clemency, the opportunity to look good in the eyes of the government and "get" his friend's murderers was too tempting to pass up.

### SIXTH AMENDMENT CONSIDERATIONS

The fact that we have found Private Weaver's testimony to be improperly admit-

ted under Mil.R.Evid. 804(b)(3) "does not lead to the automatic conclusion that confrontation rights have been denied." *Green, supra,* 399 U.S. at 156, 90 S.Ct. at 1934, 26 L.Ed.2d at 495–496. Conversely, had we found the testimony properly admitted, it may nonetheless have been precluded by sixth amendment considerations. *Id.* An examination of the "indicia of reliability" of *Dutton, supra,* is not conclusive as to sixth amendment issues. An important distinction that is often lost by anything less than a careful reading of *Dutton* is that it considered the sixth amendment's applicability to statements against penal interest only in the context of their admissibility as competent evidence. The Supreme Court did not embrace the issue of how the broader considerations of the sixth amendment could preclude the use of such statements otherwise admissible under the rule and the *Dutton* "indicia of reliability." It distinguished its holding by stating:

> This case does not involve evidence in any sense "*crucial* or *devastating,*" as did all the cases just discussed. It does not involve the use, or misuse, of a *confession made in the coercive atmosphere of official interrogation,* as did Douglas, Brookhart, Bruton, and Roberts. It does not involve any suggestion of *prosecutorial* misconduct of even *negligence,* as did Pointer, Douglas, and Barber. It does not involve the use by the prosecution of a *paper transcript,* as did Pointer, Brookhart, and Barber. It does not involve the *wholesale denial of cross-examination* as did Brookhart.
>
> \* \* \* \* \* \*
>
> (The) testimony ... was of *peripheral significance* at most ... and we conclude that its application *in the circumstances of this case* did not violate the Constitution.

*Dutton, supra,* 400 U.S. at 87–88, 91 S.Ct. at 219, 27 L.Ed.2d at 226. (Emphasis added to highlight broader issues.)

An examination of these broader sixth amendment considerations leads us to the conclusion that the consideration of Private Weaver's testimony by the members,

whether properly admitted or not, establishes separate grounds for exclusion of the testimony.

To hold that PFC Dodson's hearsay evidence could be used against appellant when PFC Dodson was unavailable for cross-examination was to some degree a limitation upon appellant's right to confront and cross-examine witnesses against him. Although this is not an absolute right, *Chambers, supra,* "any permissible restriction of this valuable constitutional right should be based on decision emanating from the Supreme Court. *United States v. McConnico,* 7 M.J. 302 (C.M.A.1979)."

The *McConnico* case was argued by government counsel in support of the admission of PFC Dodson's extrajudicial statement against penal interest under Mil. R.Evid. 804(b)(3). We do not view *McConnico* as controlling in the instant case because: (1) it held that inculpatory statements against penal interest were admissible to prove the commission of an offense as an *essential element* of the accused's prosecution as an accessory after the fact, *id.* at 308; and (2) the Court of Military Appeals assumed a violation of the accused's right to confrontation without deciding the issue. *Id.* at 309 n. 23. With appellant's case, the statement was offered as proof of the ultimate fact and, unlike *McConnico,* it reasonably contributed to appellant's conviction. *Id.* at 309.

It is our opinion that *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), is the controlling confrontation clause case. In *Douglas,* an accomplice who had been found guilty in an earlier trial was called as a witness in the defendant's trial. Since the accomplice's appeal was still pending, he invoked his privilege against self-incrimination. The state's attorney then produced a signed confession of the accomplice and, in the guise of cross-examination to refresh the witness' recollection, began to read from the document in the presence of the jury. The Supreme Court in *Douglas,* held that in the circumstances of the defendant's case, the inability to cross-examine the co-accused as

to the alleged confession was a denial of the right to cross-examination as secured by the confrontation clause of the sixth amendment. The Court looked at the co-accused's statement that the defendant fired a shotgun at a truck as constituting the *only direct evidence* that he had done so; and that, when coupled with the circumstances surrounding the shooting, "formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder." *Douglas, supra,* at 380 U.S. at 419, 85 S.Ct. at 1077. "The circumstances are therefore such that inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination. *Namet v. United States,* 373 U.S. 179, 187, 83 S.Ct. 1151 [1155], 10 L.Ed.2d 278, 284." *Douglas,* 380 U.S. at 420, 85 S.Ct. at 1077.

At appellant's trial, the majority of the government's case was establishing times and places that the accuseds were present in Henoko on the evening of the murder. The strongest circumstantial evidence of the murder was the testimony of a marine lance corporal and his Japanese girl friend in which two black males, fitting the general descriptions of appellant and PFC Dodson, were seen in the immediate vicinity of the murder close to the approximated time of the murder.

There was substantial expert testimony concerning tests for blood residue that were performed upon appellant's clothing. The findings of the experts were inconclusive. Only the possibility of the presence of blood, whether human or animal, was detected. Additionally, the government introduced a single, red thread (or fiber) which was found on appellant's clothing. Murphy's tee shirt was made from red cotton cloth. An expert testified that the fiber was consistent with that of Murphy's tee shirt, but such fibers were very common and there was no way of determining when or in what manner the thread arrived on appellant's clothing. Neither could he state conclusively that the fiber came from Corporal Murphy's tee shirt.

Private Weaver testified, that on a separate occasion, he heard appellant say, "Maybe we ought to tell them the truth. We might get off easier." Another inmate, Private Robbins, also known as "Houdini", related how appellant had told him that he had gotten into an argument with Corporal Murphy over a girl and threatened him. Appellant, according to Private Robbins, summed up the conversation by saying, "It does look bad because I did have a knife with me that night." On another occasion, Private Robbins related that he could routinely let himself out of his cell at night and wander undetected around the brig. During one of his strolls he passed by appellant's cell and overheard a soliloquy whereby appellant mumbled, according to Private Robbins, "He wished he would have left the knife back and wished he hadn't brought it with him that night, no one was supposed to get hurt." Private Robbins did not recall the statement until the night before trial, when it "slipped out" during a discussion with appellant's defense counsel, and Private Robbins thereby felt compelled to tell the prosecution lest he get in trouble.

From our independent review of the evidence, we conclude that the only *direct* evidence before the members of appellant's guilt of Corporal Murphy's murder was the statement of PFC Dodson as testified to by Private Weaver. Appellant's statements to Privates Weaver and Robbins, if true, do not establish direct complicity in the murder. They are neither "interlocking confessions," *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), nor do they render PFC Dodson's statement "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury," *Brown v. United States,* 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1972); *see also, Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). After analogizing the previous seventeen record pages of his closing argument as a "puzzle," the trial counsel characterized the overheard conversations at the brig as "the most damaging, the most devastating pieces to the puzzle." We also agree that without PFC Dodson's

statement, the members would have found the government's case significantly less persuasive. *See Schneble, id.,* 405 U.S. at 432, 92 S.Ct. at 1059.

In the instant case, PFC Dodson's statement, under the circumstances, could only be considered as directly implicating appellant in the murder of Corporal Murphy. PFC Dodson's statement of "I'm glad we did it," is sufficiently ambiguous to imply that he and LCPL Chupp did it or that he, LCPL Chupp and appellant were the perpetrators. The real issue is not how one construes the statement, but instead, its inherent ambiguity which cannot be resolved because of PFC Dodson's unavailability to testify and be cross-examined as to his intent. Also, since it is uncontroverted that PFC Dodson and appellant were together during all relevant periods the evening of the murder, to believe that PFC Dodson participated in the murder of Corporal Murphy renders the determination of appellant's guilt to a mere mathematical act. This is a classic case of guilt by association—if PFC Dodson did it, then it is inescapable that so did appellant. As such, the statement was a critical link in the chain of proof and added substantial weight to the government's case in a form not subject to cross-examination. *Bruton, supra; Douglas, supra.* Unlike *McConnico, supra,* there was more than a reasonable probability that PFC Dodson's statement contributed to appellant's conviction, and was thereby "crucial" and "devastating".

## CONCLUSIONS

We find that appellant's sixth amendment right to confront and cross-examine witnesses against him was violated in two ways: (1) by admitting PFC Dodson's statement through a witness who, under the circumstances, was unreliable, thereby calling into question the trustworthiness of the statement, *see United States v. Oliver,* 626 F.2d 254, 261 (2d Cir.1980); and (2) by relying upon PFC Dodson's inculpatory, extrajudicial statement, under Mil.R.Evid. 804(b)(3), as the only direct evidence of appellant's guilt of murder, *Douglas, supra.*

Although we are of the opinion that the evidence before the members, excluding the extrajudicial statement of PFC Dodson, was sufficient to find appellant guilty beyond a reasonable doubt of all charges, we cannot affirm the findings as to the murder charge unless we are convinced beyond a reasonable doubt that the trial result was unaffected by it. *Parker, supra; United States v. Ward,* 23 U.S.C.M.A. 572, 50 C.M.R. 837, 1 M.J. 176 (1975). Because of the undeniable certainty of guilt implied by PFC Dodson's statement, we are not convinced beyond a reasonable doubt that one or more of the members may not have relied solely upon the inadmissible testimony to the exclusion of the remaining evidence. Accordingly, we cannot affirm the findings of guilty to unpremeditated murder and felony murder.

We are convinced beyond all reasonable doubt that the otherwise appropriate guilty finding of attempted robbery was not affected by the inadmissible evidence. The admissible circumstantial and direct evidence as to that charge was substantial and overwhelming. *Brown, supra.* We affirm the findings as to Charge I, attempted robbery. Charge II, conspiracy to rob Corporal Murphy, cited as the actions to effect the object of the conspiracy the stabbing of Corporal Murphy, which resulted in his death. We find this charge to be part and parcel of the findings of guilty of murder. We, therefore, disapprove the findings of guilty as to Charge II, conspiracy to commit robbery, Charge III, Specification 1, unpremeditated murder, and Charge III, Specification 2, felony murder. In accordance with paragraph 92, *Manual for Courts-Martial, 1969 (Rev.),* the sentence is disapproved and set aside. The record is returned and a rehearing ordered as to the disapproved findings and sentence according to the guidelines of paragraph 81(*b*)(3), *MCM.* Should findings of not guilty result to all charges to be reheard, appellant's rehearing on his sentence would be limited to the approved finding of guilty as to attempted robbery.

Judge EOFF and Judge KERCHEVAL concur in the result.